UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UMAR ALLI,

                           CASE NOS.
                           11-cv-4952/11-cv-7665
                           (PKC) (KNF)

                 Plaintiff,

            v.

CAPTAIN LISA STEWARD-BOWDEN (#1225);
CAPTAIN JOHANNA BANKS (#819);
CAPTAIN JOSEPH CAPUTO, CAPTAIN B.
BEHARRI (#1603); OFFICER LYDON VICTOR (#14410);
OFFICER SANDY ARKHURST (#18507);
OFFICER BUNTON; OFFICER TERRANCE DIXON
(#17963); OFFICER ANDERSON ALCEUS (#18380);
OFFICER VELEZ (#11352);  OFFICER PHILLIPS;        **THIRD AMENDED**
OFFICER ROHR (#18104); MARK A. SCOTT                **COMPLAINT**
SHARMA  DUNBAR (#717); WARDENS
ROSE AGRO AND KATHLEEN MULVEY;
CITY OF NEW YORK; DORA SCHRIRO;
LEWIS FINKELMAN; CHARLTON LEMON;
HILDY J. SIMMONS; MICHAEL J. REGAN;
FLORENCE FINKLE; MICHAEL HOURIHANE;
LARRY DAVIS, SR.; RICHARD T. WOLF              **JURY TRIAL**
CATHY POTLER; KENNITH T. ARMSTEAD             **DEMANDED**
CORRECTIONAL HEALTH SERVICES/
PRISON HEALTH SERVICES and
JOHN DOES 1 THROUGH 6.

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

        Plaintiff, Umar Alli, through his undersigned *pro bono* counsel, hereby alleges as

follows:

### INTRODUCTION

        1.      This is a civil rights action in which Plaintiff seeks to vindicate rights secured by

42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, and

the laws and Constitution of the State of New York.

2.     This action arises from a series of events, beginning on or about May 5, 2011 when Plaintiff was brutally attacked by certain of the named-Defendants at the George R. Vierno Center ("GRVC") on Rikers Island, East Elmhurst New York (the "Incident" or "Assault").

3.     At the time of the Assault, Plaintiff was a pre-trial detainee awaiting trial and sentencing, and only nineteen years old.

4.     To conceal the attack, the Assaulting Officers, defined *infra*, conspired with other named-Defendants to, amongst other things, lodge a disciplinary infraction against Mr. Alli for a number of offenses.

5.     While a hearing was held on May 13, 2011 (the "Hearing") in connection with the infraction, the Hearing was riddled with due process deficiencies, which ran afoul of Mr. Alli's constitutional rights, the policies and directives of the New York City Department of Corrections (the "Department" or "DOC") and the laws of the state of New York.

6.     As a consequence of these massive breaches, Mr. Alli was confined to disciplinary segregation for 100 days, during which time certain named-Defendants caused Plaintiff to endure heinous confinement conditions and exhibited deliberate indifference towards Mr. Alli's serious medical needs.

7.     As a result of these and other deprivations described herein, Mr. Alli suffered physical and psychological pain, discomfort and humiliation, including, but not limited to, permanent and non-permanent physical injuries such as reduced vision, hearing loss, rashes, abrasions, lacerations and contusions.

8.     Mr. Alli seeks monetary damages (special, compensatory, and punitive) against all Defendants, public disciplining and sanctioning of certain Defendants named herein, an award of costs and attorneys' fees, and such other relief as the Court deems just and proper.

## JURISDICTION AND VENUE

9.      Jurisdiction is proper under 28 U.S.C. §§ 1331 because Plaintiff seeks to enforce rights secured by 42 U.S.C. § 1983, 1988.  This Court also has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) and (c).

## DEMAND FOR JURY

11.     Plaintiff hereby demands a trial by jury of any and all issues pertaining to this case including, but not limited to, damages.

## THE PARTIES

12.     Plaintiff Umar Alli is a United States Citizen.  At all times alleged herein, Mr. Alli was a pre-trial detainee in DOC custody, at GRVC.

13.     Defendants Lisa Steward-Bowden, Anderson Alceus, Sandy Arkhurst, Terrence Dixon and Lydon Victor ("Assaulting Officers") were, at all times referred to in this Complaint, uniformed correction officers employed by DOC and assigned to GRVC. The Assaulting Officers were required to conduct their responsibilities in accordance with Departmental directives governing the use of force, inmate access to medical care, and the minimum standards governing conditions of confinement established by the New York City Board of Corrections ("BOC").  At all times referred to in this Complaint, Assaulting Officers acted within the scope of their DOC employment and under color of state law.  These Defendants are each sued in their individual and official capacities.

14.     Defendants Beharri, Bunton, Dunbar, Phillips, Rohr and Velez ("Uniformed and Supervisory Officers") were, at all times referred to in this Complaint, uniformed officers, captains and/or first-line supervisory officers employed by DOC and assigned to GRVC.  The

3

Uniformed and Supervisory Officers were required to perform their duties in accordance with Departmental directives governing the use of force, investigation thereof, inmate access to medical care, inmate grievance procedures, due process, and BOC minimum standards. At all times referred to in this Complaint, Uniformed and Supervisory Officers acted within the scope of their DOC employment and under color of state law. These Defendants are each sued in their individual and official capacities.

15. Defendants Dora Schriro and Lewis Finkelman were at all times referred to in this Complaint, and still are, the Commissioner and First Deputy Commissioner of DOC, respectively. Defendants Schriro and Finkelman are legally responsible for the operation of all of the Department's facilities, including but not limited to the selection, supervision, promotion, training, and discipline of all uniformed and supervisory staff and personnel, and for the care, custody, and control of all inmates in DOC custody. These responsibilities were and are required to be conducted in accordance with the legal mandates applicable to DOC facilities, including but not limited to directives governing the use of force, inmate access to medical care, inmate grievance procedures, due process and BOC minimum standards. At all times referred to in this Complaint, Defendants Schriro and Finkelman acted within the scope of their DOC employment and under color of state law. These Defendants are sued in her individual and official capacities.

16. Defendants Rose Agro and Kathleen Mulvey were, at all times referred to in this Complaint, GRVC Wardens responsible for the supervision of Assaulting Officers as well as Uniformed and Supervisory Officers, and for the care, custody and control of inmates confined to GRVC. These responsibilities were and are required to be conducted in accordance with the legal mandates applicable to DOC facilities, including but not limited to directives governing

4

the use of force, inmate access to medical care, inmate grievance procedures, due process and BOC minimum standards. At all times referred to in this Complaint, Defendants Agro and Mulvey acted within the scope of their DOC employment and under color of state law. Defendants Agro and Mulvey are sued in their individual and official capacities.

17.  Defendant Mark A. Scott was, at all times referred to in this Complaint, a Supervising Warden assigned to GRVC and responsible for the supervision of Assaulting Officers as well as Uniformed and Supervisory Officers, and for the care, custody and control of inmates confined to GRVC. These responsibilities were and are required to be conducted in accordance with the legal mandates applicable to DOC facilities, including but not limited to directives governing the use of force, inmate access to medical care, inmate grievance procedures, due process and BOC minimum standards. At all times referred to in this Complaint, Defendant Scott acted within the scope of his DOC employment and under color of state law. Defendant Scott is sued in his individual and official capacities.

18.  Defendant Florence Finkle was, at all times referred to in this Complaint, Deputy Commissioner of Integrity and Policy for the DOC. In this role, Defendant Finkle was responsible for ordering and supervising the investigation of all use of force incidents and for initiating recommendations for disciplinary action against officers and captains who engage in misconduct. These responsibilities were to be conducted in accordance with the legal mandates applicable to DOC facilities. At all times referred to in this Complaint, Defendant Finkle acted within the scope of her DOC employment and under color of state law. She is sued in her individual and official capacities.

19.  Defendant Charlton Lemon was, at all times referred to in this Complaint, Deputy Warden for Security for the DOC assigned to GRVC. In this role, Defendant Lemon

was responsible for the supervision of correction officers, captains and other supervisors with respect to the care, custody and control of inmates confined to GRVC. These responsibilities were to be conducted in accordance with the legal mandates applicable to DOC facilities. At all times referred to in this Complaint, Defendant Lemon was acting within the scope of his DOC employment and under color of state law. Defendant Lemon is sued in his individual and official capacities.

20.     Defendant Larry Davis, Sr. was, until approximately December 2011, the Chief of the Department and was responsible for the supervision, oversight and discipline of the uniformed security staff, including the supervisory security staff, in all Department jails, including GRVC. These responsibilities were to be conducted in accordance with the legal mandates applicable to DOC facilities. At all times referred to in this Complaint, Defendant Davis acted within the scope of his DOC employment and under color of state law. He is sued in his individual and official capacities.

21.     Defendant Michael Hourihane was at all times referred to in this Complaint until approximately December 2011, Deputy Chief of Department, and since December 2011 has been Chief of Department. As Deputy Chief, Defendant Hourihane was responsible for monitoring and addressing all operational, safety and security matters in DOC facilities, including GRVC. These responsibilities included maintaining statistics on violent incidents at DOC facilities and creating procedures to protect the personal safety of DOC staff and inmates confined to DOC custody. At all times referred to in this Complaint Defendant Hourihane acted within the scope of his DOC employment and under color of state law. Defendant Hourihane is sued in his individual and official capacities.

22.     Defendants Michael J. Regan  and Hildy J. Simmons were, at all times referred to in this Complaint, Chair and Vice-Chair of the BOC, respectively.  Defendants Regan and Simmons were responsible for establishing and ensuring compliance with BOC minimum standards regulating conditions of confinement and health care in all New York City ("City") correctional facilities.  These Defendants were required to actively investigate serious incidents, evaluate DOC performance, review inmate grievances and make recommendations concerning the same.  At all times referred to in this Complaint, Defendants Regan and Simmons acted within the scope of their DOC employment and under color of state law.  These Defendants are sued in their individual and official capacities.

23.     Defendants Cathy Potler and Richard T. Wolf, Esq. were, at all times referred to in this Complaint, Executive Director and Deputy Executive Director of the BOC, respectively. These full-time DOC employees were responsible for ensuring that health care provided within all DOC facilities, including GRVC, was maintained "at a level consistent with legal requirements, accepted professional standards and sound professional judgment and practice." Together, Defendants Potler and Wolf were responsible for monitoring the compliance of all DOC facilities with these minimum standards.  At all times referred to in this Complaint, Defendants Potler and Wolf acted within the scope of their DOC employment and under color of state law.  These Defendants are sued in their individual and official capacities.

24.     Defendant Kennith T. Armstead was, at all times referred to in this Complaint, Director of Field Operations and a full time employee of the BOC.  In this role, Defendant Armstead supervised the daily activities of the field representatives who are required to canvas DOC facilities daily for purposes of monitoring compliance with BOC minimum standards.  In this role, Defendant Armstead was required to conduct frequent and targeted inspections of

DOC facilities to identify and resolve known problems, including but not limited to, unjustifiable uses of force and conditions of confinement in breach of BOC Minimum Standards. At all times referred to in this Complaint, Defendant Armstead acted within the scope of his DOC employment and under color of state law. Defendant Armstead is sued in his individual and official capacities.

25.    Defendants Agro, Armstead, Davis, Finkle, Finkelman, Hourihane, Lemon, Mulvey, Potler, Regan, Schriro, Scott, Simmons and Wolf are hereinafter collectively referred to as "Policy-making Defendants."

26.    At all times referred to in this Complaint, John Does 1 through 6 were field representatives, serving as BOC's "eyes and ears" into the City's jails. These six Defendants were responsible for conducting site visits at all DOC facilities for the purpose of documenting and investigating prisoner and staff complaints and violent and unusual incidents. At all times referred to in this Complaint, John Does 1 through 6 acted within the scope of their DOC employment and under color of state law. These Defendants are sued in their individual and official capacities.

27.    Defendant City of New York ("City") is a municipal corporation, which, through the Department, operates a number of detention facilities, including the GRVC. The DOC, through its senior officials at the central office and in each facility, promulgates and implements policies, including policies with respect to the use, reporting and investigation of force employed by uniformed staff, inmate grievance procedures, due process and inmate access to medical treatment and other services mandated by local law and court orders. The DOC is also responsible for the appointment, training, monitoring, supervision, hiring and conduct of all DOC personnel, including the Defendants named herein.

## NOTICE OF CLAIM

28.     On June 8, 2011, and within ninety days of the accrual of the claims stated herein,

Plaintiff, Umar Alli, served on the Comptroller of the City of New York a Notice of Claim

setting forth the time, place and manner in which his claims arose.   More than 30 days have

elapsed since the Plaintiff's Notice of Claim was served upon Defendant City and the matter has

not been settled or otherwise resolved.

## FACTUAL ALLEGATIONS

29.     The conduct engaged in by the Defendants named herein was, at all times,

subjectively and objectively unreasonable and in violation of Mr. Alli's clearly established

rights.

### Pre-textual Entry into Mr. Alli's
### Punitive Segregation Cell

30.     On May 5, 2011, Mr. Alli became yet another victim of the "pattern of brutality"

that has become "deeply entrenched" in New York City jails.  *See e.g., Nunez v. City of New*

*York*, No. 11-cv-5845 (LTS) (JCF) (S.D.N.Y. Aug. 30, 2012) (the sixth and most recent class

action challenging the "routine and institutionalized staff violence against inmates" in New York

City jails); *Ingles v. Toro*, No. 01-cv-8279 (S.D.N.Y. April 4, 2006) (requesting system-wide

relief from the excessive use of force in New York city jails); *Sheppard v. Phoenix*, No. 91-cv-

4148 (S.D.N.Y. July 10, 1998) (challenging excessive use of force in the City's Central Punitive

Segregation Unit); *Jackson v. Montemango*, No. 85-cv-2384 (E.D.N.Y. Nov. 26, 1991)

(challenging the same conduct in the Brooklyn House of Detention); *Reynolds v. Ward*, No. 81-

cv-101 (S.D.N.Y. 1990) (challenging excessive and unnecessary force in the Bellevue Prison

Psychiatric Ward); *Fisher v. Ward*, No. 83-cv-2128 (S.D.N.Y. March 28, 1990) (challenging the same conduct in the Eric M. Taylor Center, a Rikers Island jail).[1]

31.     At the time of the Assault, Plaintiff was housed in the GRVC Mental Health Assessment Unit for Infracted Inmates ("MHAUII").

32.     At approximately 10:42 pm, Defendant Steward-Bowden along with Defendant Arkhurst approached Plaintiff's cell door purportedly to serve an infraction related to a prior, unrelated incident.

33.     At approximately 10:44 pm, a third officer joined Defendants Steward-Bowden and Arkhurst outside of Mr. Alli's cell.  Upon information and belief, Defendant Dixon was the third officer.  When Defendant Dixon arrived, Defendant Steward-Bowden appeared to be completing the paperwork she intended to serve on Mr. Alli.

34.     Shortly thereafter, Steward-Bowden opened the outer portion of the cuffing port on Mr. Alli's cell, purportedly to serve the infraction.  Upon information and belief, infractions are to be served beneath or through the side of the cell door.

---

[1] In addition to these class actions, senior DOC supervisors and uniformed staff have been repeatedly sued by inmates alleging beatings by staff and DOC-sanctioned cover-ups. *See, e.g., Youngblood v. Baldwin*, No. 08-cv-5982 (S.D.N.Y. July 22, 2009) (alleging a staff beating at GRVC resulting in skull laceration and broken nose); *Rice v. New York City Department of Corrections*, No. 03-cv-582 (S.D.N.Y. Aug. 26, 2004) (alleging the beating of two inmates at GRVC resulting in collapsed lung and contusion hematomas, in one case, and neck and spinal cord injuries causing permanent stutter, in the other); *Joseph v. New York City Department of Corrections*, No. 02-cv-9219 (S.D.N.Y. May 28, 2003) (alleging beat-up at GRVC resulting in orbital fracture); *see also Reynolds v. City of New York*, No. 11-cv-621 (S.D.N.Y. Nov. 21, 2011); *Williams v. City of New York*, No. 09-cv-5734 (S.D.N.Y. Aug. 12, 2010); *Lee v. Perez*, No. 09-cv-3134 (S.D.N.Y. March 12, 2010); *Shuford v. City of New York*, No. 09-cv-945 (S.D.N.Y. Oct. 22, 2009); *Belvett v. City of New York*, No. 09-cv-8090 (S.D.N.Y. Nov. 18, 2010); *Mull v. City of New York*, No. 08-cv-8854 (S.D.N.Y. March 22, 2011); *Diaz v. City of New York*, No. 08-cv-4391 (S.D.N.Y. March 24, 2009); *Lugo v. City of New York*, No. 08-cv-2931 (S.D.N.Y. Jan. 20, 2009); *Williams v. City of New York*, No. 07-cv-11055 (S.D.N.Y. Sept. 24, 2008); *Cuadrado v. City of New York*, No. 07-cv-1447 (S.D.N.Y. Dec. 26, 2007); *Scott v. City of New York*, No. 07-cv-3691 (S.D.N.Y. Oct. 18, 2007).

35.     Prior to signing an Investigation Report and Infraction, an inmate is to be given an opportunity to review such documents.  Upon information and belief, Defendant Steward-Bowden used the cuffing port in this instance to prevent Mr. Alli from fully reviewing the report and infraction.

36.     In addition to the improper service of the infraction, Steward-Bowden attempted to pass Mr. Alli an unauthorized pen not appropriate for MHAUII inmates per DOC and/or GRVC official policy, procedure and directives.

37.     Defendant Steward-Bowden insisted that Mr. Alli take her pen, although he advised her that he had an authorized pen in his cell.  Upon information and belief, Defendant Steward-Bowden intended to claim that Mr. Alli had used her pen to harm himself thereby justifying Defendants' improper entry into Mr. Alli's cell.[2]

38.     As Mr. Alli attempted to review the infraction, he observed that the infraction was in an unusual form.  In particular, he observed that the infraction contained extra sheets of paper after the signature page, separated by a piece of carbon paper.

39.     Mr. Alli asked Defendant Steward-Bowden what was beneath the carbon paper. Rather than answering Mr. Alli's question, Defendant Steward-Bowden chastised Mr. Alli to "just hurry up, read . . . and sign" the infraction.

40.     Mr. Alli explained that he wanted to avoid signing something he could not read. In order to read the infraction in its entirety and avoid signing papers he had not reviewed, Mr. Alli attempted to review the portions of the infraction underneath the suspicious carbon paper.

------

[2] The officers' reports contain inconsistent and contradictory allegations regarding Mr. Alli's alleged attempt to harm himself with Defendant Steward-Bowden's unauthorized pen; nonetheless, all Assaulting Officers maintain that this act prompted entry into Mr. Alli's cell.

41.     Growing increasingly impatient, Defendant Steward-Bowden told Mr. Alli he was "taking too long" and pulled the infraction from the cuffing port, causing it to tear.

42.     Mr. Alli tried to assure Defendant Steward-Bowden that it was not his intention for the infraction to rip.   The officers nonetheless ordered that the control room officer open or "crack" Mr. Alli's cell.   The order was given three or four times before control room officers took notice and opened the cell door.

43.     Under DOC and/or GRVC official policy, procedure and directives, Defendant Steward-Bowden had no legitimate, non-punitive purpose in entering Mr. Alli's cell.

44.     To be sure, Mr. Alli's conduct warranted neither entry into his cell or the malicious and sadistic assault that transpired upon entry.

45.     While Assaulting Officers claim to have entered Mr. Alli's cell to prevent him from committing an act of self-harm, the fact that suicide prevent procedures were not triggered following the Incident belies any such assertion.[3]

46.     Defendant Steward-Bowden's sole purpose in entering Mr. Alli's cell was to inflict harm upon Mr. Alli.   Upon information and belief, Assaulting Officers were motivated *solely* by an interest in punishing Mr. Alli for misbehavior during Defendant Steward-Bowden's working shift ("tour") and for previously filing complaints and grievances against DOC officials.

---

[3]The Department has implemented Directive No. 4521 titled "Suicide Prevention" which would have required that certain procedures and precautions be followed if, in fact, Mr. Alli had demonstrated suicidal behavior.

12

**The Brutal Attack in Mr. Alli's Cell**

47.     The brutal battery began immediately upon entry into Mr. Alli's cell.  Defendant Arkhurst entered first, followed by Defendants Dixon and Steward-Bowden.

48.     Defendant Arkhurst delivered the first blow, a strike to Mr. Alli's left eye with a closed fist.  The force of the blow knocked Mr. Alli to the floor.  While on the floor, Defendants Arkhurst and Dixon repeatedly kicked, kneed, stomped and punched Mr. Alli.

49.     At approximately 10:46 pm, Defendants Alceus and Victor arrived and promptly joined the attack.[4]

50.     The Assaulting Officers' comments—such as "we're going to kill you;" "you think you're going to get away with fighting on our captain's tour;" "take your beating like a man;" "you deserve it;" and "cry like the little bitch you are;" amongst other debasing comments—demonstrate the malicious, sadistic and punitive motivations behind the attack.

51.     In addition, the Assaulting Officers called  Mr. Alli "a smart mouth," "snitch," and asked whether he thought he could get away with "writing complaints and grievances."

52.     These statements make it clear that the Assaulting Officers were not acting in good faith *or* in attempt to restore order but rather for the sole purpose of violating Mr. Alli's constitutional rights.

53.     Mr. Alli begged for the Assaulting Officers to stop, but the beating continued. During this time, Defendant Steward-Bowden did nothing to stop the attack.  Rather, she watched and encouraged it by cheering the other officers on.

---

[4] Upon information and belief, Defendant Victor was responsible for monitoring and supervising pantry and/or sanitation inmates.  He abandoned his post, without ensuring that these inmates were contained as required by DOC and/or GRVC directives, policies and procedures, strictly for the purpose of participating in the brutal attack on Mr. Alli.

54.     Other inmates who were either in ear shot of Mr. Alli's screams or had a direct view of the Assault beckoned for officers to cease the violent attack.

55.     Realizing that other inmates could see the attack, Defendant Steward-Bowden turned off the lights in Mr. Alli's cell.

56.     Minutes later, Steward-Bowden signaled for Defendants Alceus, Arkhurst, Dixon and Victor to end the Assault because too much time had passed.  Upon information and belief, this comment demonstrates Defendant Steward-Bowden's concern and awareness of DOC restrictions governing the presence of officers in inmates' cells.

57.     At approximately 10:49 pm, the Assaulting Officers began escorting Mr. Alli out of his cell, leading him towards the GRVC mini-clinic.

**The Attack Resumes in the Mini-Clinic**

58.     GRVC maintains a main clinic and a mini-clinic.  Upon information and belief the main clinic is a 24/7 facility.

59.     There are no cameras in the GRVC mini-clinic.  Despite countless complaints that officers frequently use this unmonitored space to physically and sexually assault inmates, no steps have been taken to correct this major loophole in prison security and inmate safety.

60.     The mini-clinic closes each day at or around 7:45 pm.  Upon information and belief, the mini-clinic is used primarily to provide treatment to punitive segregation inmates. After hours, however, punitive segregation inmates with medical needs are to be taken to the main clinic.

61.     Accordingly, by the time the Assaulting Officers approached the mini-clinic with Mr. Alli on May 5, 2011, it was already closed and there were no doctors or nurses on site.

14

62.     Assaulting Officers' reports collectively omit any reference to the mini-clinic despite the fact that GRVC cameras show Mr. Alli being taken towards the mini-clinic rather than the main clinic after leaving his cell.

63.     While Defendants Steward-Bowden and Dixon searched the control room for a key to the locked mini-clinic, Defendant Arkhurst held Mr. Alli against the wall, twisting his wrists and fingers, and threatening him with more abuse.

64.     Having failed to find a key for the mini-clinic, Defendant Dixon used a utility knife to pick the lock.  Defendants Steward-Bowden, Arkhurst, Alceus and Dixon entered the mini-clinic.  Defendant Victor left the scene and the attack continued.

65.     Prison cameras show that Mr. Alli was escorted from his cell shirtless and handcuffed.  He remained so throughout the attack.

66.     In the mini-clinic, as they had in Plaintiff's cell, Defendants Alceus, Arkhurst and Dixon took turns striking Mr. Alli in the ribs, stomach, back, head and face.  Each time Mr. Alli fell to the floor he was kicked, kneed and stomped until he was pulled back up to repeat the same vicious cycle.  During this time, Defendant Steward-Bowden encouraged these officers to continue.

67.     The attack continued for approximately ten minutes, at which point Defendants Alceus and Victor put a DOC shirt over Mr. Alli's head.

68.     Before exiting the mini-clinic, Defendant Steward-Bowden made contact with Mr. Alli's face using a sharp object she held in her hands.  The Injury to Inmate Report, completed following the attack, records abrasions on both sides of Mr. Alli's face.

69.     The Assaulting Officers threatened to "kill" Mr. Alli if he reported the Incident.

15

**Mr. Alli was Denied**
**Appropriate Medical Attention**

70.     The BOC's Minimum Health Care Standards ("MHCS") require that inmates receive prompt medical attention and explicitly prohibit delay, denial and interference with an inmate's access to medical treatment.

71.     Inmates in need of emergency services are to be granted access to such services promptly.  In addition, such services are to be provided competently and "at a level consistent with legal requirements, accepted professional standards and sound professional judgment and practice." *See* Exhibit A § 3-01(a).

72.     The care Mr. Alli received immediately after the Incident and in the several weeks that followed fell grossly below this standard.

73.     Upon arriving at the main clinic, Mr. Alli waited approximately one hour to receive medical attention, during which time he was in extreme pain and discomfort.

74.     When finally examined by the doctor on call, the bulk of Mr. Alli's visible and nonvisible injuries were *not* recorded on the Injury to Inmate Report.

75.     In addition, despite being in extreme pain, the examining doctor failed to prescribe pain medications *or* schedule follow-up appointments.

76.     After the examination, Mr. Alli was forced to walk barefoot with no aid or assistance back to his cell.

77.     Had Mr. Alli received a proper exam, treatment and follow-up care, as required under the MHCS, the permanent injuries he sustained would surely have been minimized.

**The May 10, 2011 Infraction &**
**Corresponding Cover-up**

78.     On May 10, 2011, the Assaulting Officers infracted Plaintiff for disciplinary offenses purportedly arising out of his conduct during the Assault (the "Infraction").

79.     This Infraction was the first of a series of events intended to cover-up the initial wrongful act, namely the malicious Assault on Mr. Alli.

80.     The Infraction, as required under DOC policy, triggered an investigation. This investigation was, however, laced with inefficiencies, bias and due process violations.

81.     For instance, Defendant Steward-Bowden, who was the master-mind and, indisputably, a participant in the Assault, also participated in the investigation of the Incident. Such participation is strictly prohibited by DOC directives.

82.     In addition, Defendant Banks did not initiate the investigation within 24 hours of the alleged offenses, failed to investigate Mr. Alli's excessive force allegations, failed to obtain statements from material witnesses and failed to seek mental health clearance prior to conducting the investigation.

**The May 13, 2011 Hearing &**
**Corresponding Due Process Violations**

83.     The May 13, 2011 Hearing further perpetuated the cover-up.

84.     Prior to the Hearing, Adjudication Captain Joseph Caputo failed to review the Infraction for due process violations and failed to investigate and report Mr. Alli's allegations of excessive force.

85.     In fact, when Mr. Alli informed Defendant Caputo of the Assault in the mini-clinic, the latter responded that it did not concern him.

86.     Defendant Caputo declined to question Assaulting Officers regarding inconsistencies and omissions in their reports, including the omission of the attack in the mini-clinic.

87.     Instead, despite Mr. Alli's assertion that he had been assaulted in the mini-clinic following the assault in his cell, Defendant Caputo discounted these allegations because the mini-clinic was not mentioned in Assaulting Officers' reports.

88.     Defendant Caputo similarly failed to review and/or facilitate the preservation of video evidence capturing the Assault, and denied Mr. Alli the opportunity to call and examine witnesses during the Hearing, even though these witnesses would have offered material non-duplicative evidence.

89.     As an example, Kiaza Loccenitt, witnessed the attack but was prevented from offering a voluntary statement.  Mr. Loccenitt offered a declaration to this effect in the Article 78 proceeding initiated by Mr. Alli after the Hearing.

90.     Notably, on September 28, 2011, the Supreme Court of New York ordered that the Infraction be expunged and the 100 day disciplinary penalty credited to Mr. Alli.  These days, to date, have not been credited.

### Defendants Demonstrated Deliberate Indifference to Mr. Alli's Need for Medical Care

91.     In the weeks following the Assault, Mr. Alli was denied access to necessary medical treatment, causing him to suffer permanent physical injury proximately related to the Attack.

92.     During his disciplinary segregation, Mr. Alli made daily requests to be seen by sick-call personnel, all of which were ignored.

93.     For instance, Mr. Alli made daily requests for medical care to Defendants Beharri, Bunton, Dixon, Phillips, Rohr and Velez during their frequent tours of Mr. Alli's housing area.

94.     Although Mr. Alli was on medication for back pain and approved for care by a physical therapy, these Defendants repeatedly denied Mr. Alli's requests to see his physical therapist in violation BOC Health Care Minimum Standards and constitutional principles.

95.     Mr. Alli reported these denials to Defendants Steward-Bowden and Dunbar, both captains of Mr. Alli's housing area.

96.     Steward-Bowden and Dunbar were responsible for the discipline, supervision, monitoring and training of the housing area officers in their charge but failed to order or otherwise facilitate Mr. Alli's access to medical treatment.

97.     Upon information and belief, Defendants John Does 1 through 6 canvased GRVC during this period but failed to document, report, investigate, remedy or otherwise intervene in protection of Plaintiff's constitutional rights.

98.     The joint and conspiratorial action of Defendants Steward-Bowden, Dunbar, Beharri, Bunton, Dixon, Phillips, Rohr, Velez and John Does 1 through 6 constituted deliberate indifference to a substantial risk posed to Mr. Alli's health and safety and fell short of DOC and BOC directives, policies and standards.

**Mr. Alli Reports Medical Needs**
**to Policy-making Defendants**[5]

99.    Unable to obtain assistance from GRVC officers and supervisory staff, Mr. Alli

began reporting these deprivations to the Policy-making Defendants named herein.

100.    In a letter dated May 18, 2011, Mr. Alli complained to Defendants Schriro,

Mulvey and/or Agro[6] and Simmons, informing them that he had been assaulted in his cell at

GRVC and that he was not *"receiving medical care, despite . . . numerous complaints of severe*

*pain.  I am in imminent danger and receiving numerous death threats from officers and*

*capt[a]ins."*

101.    On May 23, 2011, Mr. Alli received a boiler-plate response from the Director of

Constituent Services, an employee within the office of Defendant Schriro, advising him in

general terms that "the issues described in [his] letter are currently being investigated."

102.    On June 1, 2011, Mr. Alli wrote the Central Office Review Committee

referencing prior grievances, describing his injuries and noting that he was being *"deprived [of]*

*medical care and forced to live under foul conditions.  I also am struck around [by] these*

*officers who[] daily harass me.  Please help, adhere and investigate my complaint."*

103.    On June 2, 2011, a Legal Aid staff attorney wrote to Defendants Armstead,

Finkle, Finkelman, Potler and Wolf on Mr. Alli's behalf.  The email noted that Mr. Alli was

being denied *"pain medication and other basic necessities . . . while . . . detained in punitive*

*segregation"* and requested that Mr. Alli be *"seen by medical staff as soon as possible"* and

---

[5] To the extent certain letters are undated or without addressee information, Plaintiff relies in good faith on the affidavits of service produced in discovery to determine when and to whom such letters were sent.

[6] To the extent Defendant Mulvey was no longer in the position of GRVC Warden, the letter would have been forwarded to Defendant Agro.

given "*appropriate and necessary medical treatment.*"  (referred to hereinafter as the "Wilker Email").

104.    On June 6, 2011, a Legal Aid Society intern wrote Defendant Finkle, advising him that Alli had "*suffered ocular damage to his left eye, bleeding from his right ear, soft tissue damage to his back, which has caused persistent back pain, extensive bruising to his ribs, and abrasions and contusions on his face and head.*"

105.    On the same day, a Legal Aid Society intern wrote Defendants Armstead, Potler and Wolf, advising them that Mr. Alli had "*suffered a severe traumatic injury to his ear, among other injuries, during a use of force incident at GRVC on May 5 and that he has not been seen by medical staff with respect to that injury.*" Sawyer requested that "*Alli's ear [be] evaluated as soon as possible*" and that he "*receive whatever treatment he needs.*"

106.    On June 21, 2011, Mr. Alli received a response from an IGRP Investigator in Defendant-Schriro's office.

107.    The investigator, a subordinate of Defendant Schriro, advised Mr. Alli that although the commissioner was in receipt of Mr. Alli's complaint, the complaint would not be pursued because Mr. Alli had not submitted the complaint internally.

108.    This advice was misguided given that DOC Directive No. 3376 excludes Inmate allegations of physical assault from the Inmate Grievance and Request program.

109.    This misinformation is a clear example of the City and Policy-making Defendants' failure to train DOC officers, staff and employees.  Such failures make it possible for DOC employees to violate and cover-up their unlawful conduct with impunity.

110.    When Mr. Alli was finally examined and diagnosed, he was nonetheless denied follow-up care, treatment and medication which further aggravated his injuries.

111.     Mr. Alli's medical records confirm that the vision in his left eye has been severely compromised as a result of the Assault.  Medical doctors who have examined Mr. Alli have detected *trauma, iridodialysis, cataract, fluid and scarring* in Mr. Alli's left eye.

112.     When finally examined by a specialist, Mr. Alli was prescribed eye drops and pain medications, which prison officials and prison doctors denied him.  Mr. Alli, to date, is awaiting surgery for his eye.

113.     These records also confirm that Mr. Alli has suffered hearing loss and requires use of a hearing aid.

114.     A medical report dated February 2, 2012 noted that Mr. Alli had been *"waiting for a hearing aid for 4-5 months."*  Mr. Alli was fitted for a hearing aid but has not yet received one.

### The Confinement Conditions imposed on Mr. Alli
### Were Punitive and Contrary to Constitutional Mandates

115.     In the weeks following the Assault, Mr. Alli was forced to endure harsh and humiliating conditions antithetical to basic standards of human dignity.  These conditions violated his Constitutional rights, New York law, BOC Minimum Standards and other DOC policies and directives.

116.     Defendants-Assaulting Officers and Defendants-Uniformed and Supervisory Officers conspired to create these conditions for no legitimate non-punitive penological purpose.

117.     Upon information and belief, these Defendants intended to punish Mr. Alli for filing prior grievances and to prevent Mr. Alli from filing grievances regarding the conditions of his confinement at that time.

118.    During this period, Mr. Alli was placed in a cell covered in feces. Despite many requests, Mr. Alli was not given cleaning supplies, nor were cleaning personnel instructed to sterilize his cell.

119.    Defendant Victor was the sanitation officer during the relevant period. It was directly within his realm of duty to instruct maintenance personnel to sanitize or otherwise tend to Mr. Alli's cell.

120.    Defendant Victor had no legitimate non-punitive penological purpose in failing to ensure compliance with BOC Minimum Standards in this regard.

121.    Mr. Alli's cell was also extremely cold during this period because of the high levels of air conditioning in MHAUII.

122.    Defendants-Assaulting Officers and Defendants-Uniformed and Supervisory Officers knew that Mr. Alli did not have warm clothing in his cell, given that they were able to observe him during their respective tours.

123.    These officers maliciously, and with deliberate indifference, refused to provide Mr. Alli with blankets, sheets or warm clothing. Mr. Alli was forced to sleep *under* a naked mattress to keep warm.

124.    Defendant Victor was the linen exchange officer during the relevant period. It was thus directly within his realm of duty to provide Mr. Alli with clean and appropriate clothing. Defendant Victor had no legitimate non-punitive penological purpose in failing to ensure compliance with BOC Minimum Standards in this regard.

125.    A working toilet and sink in each cell is mandated by BOC Minimum Standards. Upon information and belief, Defendant Rohr intentionally turned off water in Mr. Alli's cell.

As a result, Mr. Alli was forced to either hold his bowel movements or use a non-functional toilet.

126.   When Mr. Alli reported these matters to Defendants-Assaulting Officers and Defendants-Uniformed and Supervisory Officers, he was told to "deal with it," to "have fun smelling his own feces," and that these conditions were his punishment for acting like a "dick," for "snitch[ing]" and for writing complaints.

127.   Defendants' comments in this regard illustrate the punitive, evil and retaliatory motive behind their despicable conduct.

128.   Mr. Alli was also denied phone usage.  Upon information and belief, Defendants did so for the purpose of preventing Mr. Alli from calling the Department of Investigation or his attorney.

129.   Indeed, during this period, Defendants Steward-Bowden, Beharri, Dixon, Phillips and Velez denied Mr. Alli's requests to call his counsel.

130.   Mr. Alli was also prohibited from showering during this period.

131.   Mr. Alli complained of these conditions to Defendants Steward-Bowden, Beharri, Bunton, Dixon, Dunbar, Phillips, Rohr, and Velez who exhibited deliberate indifference.

132.   Rather than taking ameliorating action, these and other officers laughed and teased Mr. Alli during their daily tours and encouraged inmates to do the same, causing Mr. Alli embarrassment, humiliation and emotional distress.

133.   Defendants-Assaulting Officers and Defendants-Uniformed and Supervisory Officers had no legitimate non-punitive penological purpose for subjecting Mr. Alli to these unconscionable conditions.

24

134.    These conditions, while far below the minimum standards to be afforded to all inmates, were made even more deplorable as Mr. Alli was housed in MHAUII.

135.    Defendants John Does 1 through 6 canvased GRVC during this period and failed to document, report, investigate, remedy or otherwise intervene to protect Plaintiff's constitutional rights.

**Mr. Alli Reports Confinement Conditions
  to Policy-making Defendants**

136.    On May 18, 2011, Mr. Alli wrote Defendants Mulvey and/or Agro, Schriro and Simmons to provide a detailed report of the conditions to which he was being subjected.

137.    The letter states, in part, "*I was placed in a cell with feces on the walls, with no working toilet or sink due to officers turning of[f] my water, no personal property or sheets & blankets. . . . No cleaning materials were provided to clean feces even after complaining to officers.*" The letter also noted that Mr. Alli was denied phone usage during this period.

138.    In a letter dated May 19, 2011 which, upon information and belief, was sent to Defendants Mulvey, Schriro and Simmons, Mr. Alli wrote about being denied sheets, a blanket, phone usage, and the ability to use the toilet and sink.

139.    In addition, Mr. Alli stated that he had informed Defendants Beharri, Steward-Bowden, Dixon, Rohr, Velez and other DOC personnel, all of whom demonstrated deliberate indifference to the substantial risk posed to Mr. Alli's health and safety by these conditions.

140.    On May 26, 2011, Mr. Alli wrote a complaint to the GRVC Warden. Upon information and belief, Defendant Agro had, by that time, assumed the position of GRVC Warden. The letter stated:

> *I have [written] many grievances and have received no response.  [T]his is an appeal for the grievances I filed on May 12, 2011.  I also have wrote you ample times for the same incident on May 5, 2011, where I was assaulted in my cell and*

*the mini-clinic of GRVC. I'm being force[d] to undergo unsanitary condition[s] and being denied medical care. Please help.*

141.   The Wilker Email, discussed at paragraph 103, *supra*, further informed Defendants Finkle, Finkelman, Armstead and Wolf that Mr. Alli was being denied "*ample food*" and requested that these Defendants and the other recipients ensure that Mr. Alli "*receive[] all meals each day and any other mandated services.*"

142.   On June 8, 2011, Mr. Alli received a second boiler-plate response from the Director of Constituent Services, an employee within the office of Defendant Schriro, advising him in general terms that "the issues described in [his] letter are currently being investigated."

143.   Mr. Alli wrote Defendant Schriro again on June 12, 2011 stating:

*I have not received a grievance log number [n]or ha[ve] any of my appeal steps . . . been answer[ed]. Please help resolve this matter and remove me from these cruel conditions, . . . discipline the officers whom participated in these actions and the grievance staff and committee for not answering my grievances including but not limited to my May 12, 2011 grievances. Also keep me away from the following staff because they were trying to harm me; Officer Dixon, Arkhurst, Victor, Alceus, Rohr, Phillips, Bunton and Captains Steward-Bowden, Beharri and Dunbar.*

144.   These letters were cries for help and put Defendant Schriro and the City on notice that Mr. Alli's health and safety were substantially at risk.

### Defendants' Conduct Egregiously Violated DOC and BOC Policies & Directives

A.   Use of Force Directive

145.   The Department has implemented Use of Force Directive No. 5006R (attached as "**Exhibit A**" hereto).  Under this Directive, force is to be used only after all reasonable efforts to resolve a situation have failed.

146.   Correction officers and DOC staff are permitted to use force commensurate to the level of treat posed by the inmate at that time.

147.   This directive prohibits use of force as a means to *punish*, when an inmate poses no threat, or when an inmate is not resisting staff.

148.   This directive mandates that "blows should not be struck if control holds, grasping" or other less harmful methods "would be adequate to restrain the inmate."

B.   Health Care Minimum Standards

149.   The BOC has established minimum standards pertaining to inmate access to medical care (attached as "**Exhibit B**" hereto).

150.   Medical care within DOC facilities is to be maintained "at a level consistent with legal requirements, accepted professional standards and sound professional judgment and practice."

151.   These standards contemplate (i) the provision of prompt medical treatment and follow-up care as well as emergency services; (ii) the regular training and development of health care personnel and correctional staff as appropriate to their role in the health care delivery system; and (iii) an ongoing review and assessment of the quality of care provided to inmates.

152.   In addition, these standards expressly prohibit DOC staff, officers and personnel from delaying, denying or otherwise interfering with an inmate's access to medical attention.

153.   DOC officers with knowledge of an inmate's need for medical care are to report such need promptly.

154.   In addition, all decisions regarding medical attention are to be made by health care personnel *only* and sick calls are to be available to inmates every day within 24 hours of a request for care.

155.    To the extent appropriate treatment for an inmate's injuries is not available within the correctional facility, these standards mandate that specialty services be provided to inmates *in the time frames specified* by referring medical personnel.

C.    Minimum Standards Governing Conditions of Confinement

156.    The BOC has established Minimum Standards pertaining to inmate conditions of confinement that apply to all inmates (attached as "**Exhibit C**" hereto).

157.    These standards prohibit the imposition of restrictions on inmates that do not serve a legitimate non-punitive penological purpose.

158.    These standards afford inmates the right to shower daily, and require that all inmates be given personal health items, including soap, toothbrushes and powder (a substitute for toothpaste), towels and toilet paper.

159.    These standards mandate that inmates be given adequate bedding, which includes one pillow and pillow case, two sheets, one mattress, a mattress cover and "*sufficient blankets to provide comfort and warmth.*" (emphasis added)

160.    These standards mandate the "regular cleaning of all housing areas including *cells*, tiers, dayrooms, and windows" (emphasis added) and contemplate that inmates will be given brooms and mops, appropriate cleaning substances and disinfectants, and other materials sufficient to properly maintain their living spaces.

161.    These standards govern inmate clothing and require that inmates be provided with clean clothes every four days.  All named-Defendants were required to adhere to and/or ensure compliance with these standards.

D.     Due Process Directive

162.     The Department has implemented Inmate Disciplinary Due Process Directive No. 6500R-B (attached as "**Exhibit D**" hereto).

163.     This Directive requires that DOC enforce its rules and regulations "fairly and in accordance with due process requirements," and sets forth the process for investigating disciplinary misconduct in DOC facilities.

164.     The investigative process begins with a Report and Notice of infraction ("RNI"), to be prepared whenever "an employee reasonably believes an inmate has violated an institutional or Departmental rule."

165.     The RNI is to be "legible, detailed, and specific regarding the time and place of the rule violation(s) and shall include the description of the inmate's actions and behavior."

166.     The investigation is to be conducted by a Supervising Officer who neither participated in or witnessed the subject-incident and is to commence within 24 hours of the incident.

167.     Directive No. 6500R-B instructs that an infraction be dismissed for due process violations, including but not limited to, failure to commence the investigation within 24 hours, as well as the inclusion of contradictory, incorrect and/or inconsistent allegations.

168.     This directive requires that use of force allegations by the infracted inmate be reported and that all relevant evidence be reviewed by the Adjudication Captain who is then instructed to make a determination as to "*why and where* injuries were inflicted on the inmate[.]" (emphasis added)

169. This directive further requires that any allegation by the infracted inmate of "abuse of authority, malfeasance or corruption on the part of [DOC] personnel . . . be reported *in writing* directly to the Inspector General's Office." (emphasis added)

170. Significantly, this directive states in no uncertain terms that witnesses requested by the infracted inmate "should be called" in accordance with relevant procedures unless unavailable.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

171. Pursuant to Directive No. 3376, Inmate allegations of physical assault are *not* subject to the Inmate Grievance and Request program. Nonetheless, Mr. Alli has exhausted administrative remedies with respect to all claims raised herein.

172. On May 27, 2011, Plaintiff served a grievance on the GRVC grievance clerk in which he complained of all of the conduct at issue herein. The letter read, in pertinent part:

> *On May 5th I was assaulted by officers. On May 8th, I was placed in a cell with feces on the walls, no working sink or toilet . . . no personal property, phone usage or blankets. Despite numerous complaints on all the above, no changes were made.*

173. On June 1, 2011, Mr. Alli mailed a letter to the Central Office Review Committee which noted, in pertinent part, "*I was assaulted on May 5, 2011 in my cell and the mini clinic resulting [in] multiple injuries. I have been deprived medical care and forced to live under foul conditions.*"

174. On June 28, 2011, Mr. Alli wrote a letter to the GRVC Grievance Supervisor which advised that as a result of the Assault, Mr. Alli was experiencing "*pains in [his] head and eyes,*" reduced vision, deafness and severe back pains.

175.    In addition, multiple complaints documenting the conduct at issue herein were made to Defendants Agro, Armstead, Finkle, Finkelman, Mulvey, Schriro, Simmons and Wolf, both by Mr. Alli and the Legal Aid Society acting on his behalf.

176.    In any event, Plaintiff's efforts to strictly comply with grievance procedures were inhibited by the conduct of DOC staff.  Despite numerous requests for the relevant grievance directives, DOC staff refused to provide them to Mr. Alli.

177.    Upon information and belief, DOC staff has, on more than one occasion, confiscated copies of the grievance directives found in the possession of inmates.

178.    Due to the complexity of the grievance process, Mr. Alli required assistance to fully understand the process required for administrative exhaustion.  However, DOC staff were unable and/or unwilling to explain the necessary steps of exhaustion.

179.    In addition, the MHAUII area in which Plaintiff was confined was not equipped with a grievance box, nor did grievance officers regularly canvas the MHAUII unit.  Thus, any failure by Mr. Alli to exhaust administrative remedies should be excused.

### Mr. Alli's Injuries

180.    As a direct and proximate result of the unlawful actions taken by the Defendants named-herein, Plaintiff has suffered harm, in the form of, *inter alia*, mental anguish, humiliation, emotional distress, permanent and non-permanent physical injury, including but not limited to reduced vision, hearing loss, rashes, abrasions, lacerations, aggravated back-pain and contusions.

## CLAIMS FOR RELIEF

### FIRST CLAIM: CLAIM FOR FOURTEENTH AMENDMENT VIOLATIONS
### COUNT I:
Against Assaulting Officers for Use of
Excessive Force Pursuant to § 1983

181.    Plaintiff repeats, re-alleges and incorporates by reference the Paragraphs above as if fully set forth herein with the same force and effect.

182.    Defendants Steward-Bowden, Alceus, Arkhurst, Dixon and Victor willfully violated Mr. Alli's constitutional rights by subjecting him to excessive force for no legitimate non-punitive penological purpose.

183.    These Defendants acted in clear violation of Mr. Alli's clearly established rights and well-settled legal principles, of which a reasonable person should have been aware, and are not entitled to a good faith or qualified immunity defense.

184.    As a proximate result of the Assaulting Officers' conduct, Mr. Alli suffered severe and permanent injuries, including hearing loss, reduced vision, lacerations, contusions, aggravated back-pain, other physical injuries and emotional harm.

185.    Defendants' conduct demonstrated deliberate indifference to the substantial risk such excessive use of force posed to Mr. Alli's health and safety.  Mr. Alli is entitled to damages for this conduct.

32

## COUNT II:
Against Defendants-Assaulting Officers and Defendants Beharri, Bunton, Dunbar, Phillips, Rohr, Velez, John Does 1 through 6 and Correctional Health Services/Prison Health Services for Deliberate Indifference to Medical Needs Pursuant to § 1983

186.    Plaintiff repeats, re-alleges and incorporates by reference the Paragraphs above as if fully set forth herein with the same force and effect.

187.    Defendants Steward-Bowden, Alceus, Arkhurst, Dixon, and Victor intentionally delayed, postponed and/or interfered with Mr. Alli's need for medical attention following the Assault.

188.    These Assaulting Officers then conspired with Defendants Beharri, Bunton, Dunbar, Phillips, Rohr and Velez to prevent Mr. Alli from receiving necessary, appropriate and prompt medical care.

189.    Despite Mr. Alli's numerous complaints to each of these officers and John Does 1-6, these Defendants delayed, denied, postponed, or otherwise interfered with Mr. Alli's access to medical care for no legitimate non-punitive penological purpose.

190.    These Defendants acted in clear violation of well-settled law, of which a reasonable person should have been aware, and are not entitled to a good faith or qualified immunity defense.

191.    By their conduct, these Defendants demonstrated deliberate indifference to the substantial risk posed to Mr. Alli's health and safety as a result of his injuries.

192.    As a proximate result of the Assaulting Officers' conduct, Mr. Alli suffered severe and permanent injuries, including hearing loss, reduced vision, lacerations, contusions, aggravated back-pain, other physical injuries and emotional harm.

193.    Mr. Alli is entitled to damages for this conduct.

**COUNT III:**
Against Defendants Banks and Caputo
for Violation of Due Process Pursuant to § 1983)

194.    Plaintiff repeats, re-alleges and incorporates by reference the Paragraphs above as if fully set forth herein with the same force and effect.

195.    Pre-trial detainees are entitled to certain procedural protections whenever further loss of liberty can result from disciplinary action.

196.    Under the Fourteenth Amendment, an inmate is entitled to (i) advanced notice of the charges against him; (ii) a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; and (iii) a fair and impartial hearing officer, amongst other things.

197.    This standard is supplemented by DOC Directive 6500R-B, which establishes the procedure for processing pre-hearing detention and inmate disciplinary infractions.

198.    Defendant Caputo violated DOC due process procedures as well as Mr. Alli's constitutional rights by, amongst other things:

(i)     failing to dismiss the Infraction despite the fact that Defendant Steward-Bowden, who participated in the Assault, was also involved in the investigation;

(ii)    failing to dismiss the Infraction on due process grounds given that the investigation was not initiated within 24 hours of the Incident;

(iii)   failing to call witnesses with knowledge of the Incident;

(iv)    failing to credit Mr. Alli's account of the Incident;

(v)     failing to take, review and preserve crucial evidence, including witness accounts, videotape, medical records and physical evidence;

(vi)    turning a blind eye to inconsistencies in material facts stated in the investigative and officers' reports;

(vii)   relying on facts outside of the evidentiary record;

34

(viii)  confining Plaintiff to 100 days of disciplinary segregation;

(ix)  failing to credit said days upon the outcome of the Article 78 proceeding; and

(x)  failing to consider Plaintiff's mental health status during the hearing.

(xi)  failing to make a determination as to whether Mr. Alli was assaulted in the mini-clinic on May 5, 2011.

199.  Defendant Banks violated DOC due process Directives and Mr. Alli's constitutional rights by, amongst other things, (i) failing to interview witnesses with knowledge of the Incident; (ii) failing to commence an investigation within 24 hours of the Incident; (iii) conducting a biased investigation; and (iv) failing to obtain mental health clearance prior to conducting the investigation.

200.  Defendants Banks and Caputo acted in clear violation of well-settled law, of which a reasonable person should have been aware, and are not entitled to a good faith or qualified immunity defense.

201.  These deficiencies led to Mr. Alli's disciplinary confinement and loss of liberty without due process of law in violation of Mr. Alli's clearly established rights.

202.  Mr. Alli is entitled to damages for this conduct.

## COUNT IV:
Against Policy-making Defendants for Due Process Violations Pursuant to § 1983

203.  Plaintiff repeats, re-alleges and incorporates by reference the Paragraphs above as if fully set forth herein with the same force and effect.

204.  Policy-making Defendants have, for some time, been on actual notice of the inadequacy of hearings offered to inmates within the GRVC and other DOC facilities.

35

205.    Former and current lawsuits made plain that Hearing and Investigating Officers frequently fail to credit inmate accounts, fail to take, review and preserve crucial evidence, including witness accounts, videotapes, medical records and physical evidence.

206.    Policy-making Defendants' failure to take measures to correct these behaviors created an environment where subordinates were and continue to be able to commit due process and other violations with impunity.

207.    Such failure to act constituted deliberate indifference to the rampant due process violations within DOC facilities, including GRVC, in connection with the administration of inmate infractions and disciplinary procedures.

208.    In addition, Policy-making Defendants affirmed Defendant Caputo's Hearing determination by failing to take action even after the Infraction was expunged by the New York Supreme Court.

209.    In so doing, these Defendants directly participated in the liberty deprivations imposed upon Mr. Alli and violated Mr. Alli's clearly established rights.

210.    Policy-making Defendants acted in clear violation of well-settled law, of which a reasonable person should have been aware, and are not entitled to a good faith defense or qualified immunity defense.

211.    Mr. Alli is entitled to damages for this conduct.

### COUNT V:
**Against Defendants Assaulting Officers, Defendants Uniformed and Supervisory Officers, Defendants Agro, Armstead, Finkle, Finkelman, Mulvey, Potler, Schriro, Simmons and Wolf, and Defendants John Does 1 through 6 for Constitutionally Inadequate Conditions of Confinement Pursuant to § 1983**

212.    Plaintiff repeats, re-alleges and incorporates by reference the Paragraphs above as if fully set forth herein with the same force and effect.

36

213.    The conditions of Plaintiff's confinement following the Assault and throughout the 100 day disciplinary confinement were objectively and subjectively serious and an affront to the basic dignities afforded to inmates under the United States Constitution and New York law.

214.    Following the Assault and throughout the disciplinary period, Mr. Alli was deprived of adequate food, clothing, medical care, a working toilet and sink; he was forced to hold his feces or use a non-working toilet; he was deprived of cleaning items and personal property mandated by BOC Minimum Standards; and forced to occupy a cell covered in feces.

215.    Assaulting Officers conspired with Defendants Uniformed and Supervisory Officers to impose these conditions in an attempt to punish Mr. Alli for filing grievances and for prior misconduct.

216.    Defendants John Does 1 through 6 were responsible for regularly canvasing all DOC facilities during this time period, including GRVC and MHAUII and were required, but failed to, record and investigate Mr. Alli's complaints regarding the heinous conditions to which he was being subjected.

217.    In addition, Defendants Agro, Armstead, Finkle, Finkelman, Mulvey, Potler, Schriro, Simmons and Wolf were aware of the conditions imposed on Mr. Alli and failed to take corrective action.

218.    The multiple complaints made by Mr. Alli to Defendants Agro, Armstead, Finkle, Finkelman, Mulvey, Schriro, Simmons and Wolf provided sufficient information from which to draw an inference that Mr. Alli's health and safety were substantially at risk as a result of these conditions and Mr. Alli's clearly established rights.

219.    These Defendants acted in clear violation of well-settled law, of which a reasonable person should have been aware, and thus are not entitled to a good faith defense or qualified immunity defense.

220.    Mr. Alli is entitled to damages for this conduct.

### COUNT VI:
#### Municipal & Supervisory Liability Pursuant to § 1983 for All Claims

221.    Plaintiff repeats, re-alleges and incorporates by reference the Paragraphs above as if fully set forth herein with the same force and effect.

222.    Defendants Agro, Armstead, Davis, Finkle, Finkelman, Hourihane, Lemon, Mulvey, Potler, Regan, Schriro, Scott, Simmons and Wolf are municipal agents "whose acts may be fairly said to be those of the municipality."

223.    These Defendants failed to intervene to protect Plaintiff's constitutional rights from infringement, were grossly negligent in supervising subordinates who committed the wrongful acts, and/or aided and abetted and/or conspired to deprive, participated in depriving, and/or did deprive Plaintiff of certain constitutionally protected rights including, but not limited to:

    (i)     the right not to be subjected to excessive force;

    (ii)    the right to a fair investigation and non-biased disciplinary hearing in connection with disciplinary infractions and offenses;

    (iii)   the right to conditions of confinement commensurate to BOC Minimum Standards and the United States Constitution;

    (iv)   the right to medical care commensurate to BOC Health Care Minimum Standards and the United States Constitution; and

    (v)    the right to complain about and/or grieve all matters involving the misconduct of DOC uniformed officers and officials.

224.  The City and Policy-making Defendants knew or should have known that their employees, agents, and subordinates had the propensity to engage in the illegal and wrongful acts described herein.

225.  Indeed, upon information and belief, Defendants Arkhurst, Beharri, Bunton, Dixon, Dunbar, Philips, Steward-Bowden, Velez and Victor, have all been implicated in excessive force incidents involving inmates housed in GRVC or other DOC facilities.

226.  In addition, the City and Policy-making Defendants have been aware for some time (from lawsuits, notices of claim, and complaints from inmates, their family members, friends, press reports and internal investigations) that their employees, subordinates and agents routinely engage in incidents of excessive force followed by concerted efforts to cover up wrongdoing.

227.  The City and Supervisory Defendants created, fostered, perpetuated and promoted unconstitutional customs, practices and policies by, amongst other things:

  (i)  failing to protect and supervise detainees within the care, custody and control of the DOC;

  (ii)  failing to equip unmonitored areas, such as the GRVC mini-clinic with cameras and/or other devices to reduce the incidence of physical assault on inmates;

  (iii)  failing to implement and develop policies and procedures sufficient to safeguard the health, safety and welfare of detainees within the care custody and control of the DOC;

  (iv)  failing to enforce existing rules designed to safeguard the health, safety and welfare of detainees within the care, custody and control of the DOC;

  (v)  failing to discipline and/or prosecute correction officers for employing excessive force against detainees in their care, custody and control or engaging in other misconduct under color of state law;

(vi)    failing to train and instruct subordinate employees regarding the inmate grievance process and the protections guaranteed to all inmates and detainees subject to disciplinary infractions and/or hearings;

(vii)   failing to monitor the conduct of subordinate employees to determine whether DOC directives and official polices were being complied with; and

(viii)  failing to investigate and penetrate the code of silence amongst officers participating in wrongful conduct.

228.    These Defendants acted in clear violation of well-settled law, of which a reasonable person should have been aware, and are not entitled to a good faith defense or qualified immunity defense.

229.    These failures facilitated, promoted and exacerbated the unconstitutional practices which proximately caused the injuries alleged herein and violated Plaintiff's clearly established rights.

230.    Plaintiff is entitled to damages for this conduct.

### SECOND CLAIM: CLAIM FOR FIRST AMENDMENT VIOLATIONS
Against Assaulting Officers and Defendants Uniformed and Supervisory Officers for Unlawful Retaliation Pursuant to § 1983

231.    Plaintiff repeats, re-alleges and incorporates by reference the Paragraphs above as if fully set forth herein with the same force and effect.

232.    Plaintiff's First Amendment right to complain and to file grievances was chilled by the conduct described herein.

233.    As demonstrated by their comments during the attack, Assaulting Officers were motivated in part by retaliation against Mr. Alli for reporting the prior misconduct of DOC officers.

234.    Defendants Beharri, Bunton, Dunbar, Phillips, Rohr and Velez thereafter caused further First Amendment deprivations by preventing Mr. Alli from making calls to family

members, his attorney and investigative agencies to report the heinous conditions he was forced to endure.

235.    In addition, during Mr. Alli's disciplinary segregation, DOC staff and employees restricted Mr. Alli's access to grievance procedures.

236.    The aforementioned conduct would prevent a person of ordinary firmness, and did prevent Mr. Alli, from exercising clearly established rights guaranteed by the First Amendment.

237.    These Defendants acted in clear violation of well-settled law, of which a reasonable person should have been aware, and are not entitled to a good faith defense or qualified immunity defense.

238.    Mr. Alli is entitled to damages for this conduct.

### THIRD CLAIM:  CLAIM FOR ASSAULT & BATTERY
#### Against Assaulting Officers

239.    Plaintiff repeats, re-alleges and incorporates by reference the Paragraphs above as if fully set forth herein with the same force and effect.

240.    At all times alleged herein, Defendants Steward-Bowden, Alceus, Arkhurst, Dixon and Victor were acting within the scope of their employment and under color of state law.

241.    Upon approaching and entering Mr. Alli's cell, Defendants Steward-Bowden, Alceus, Arkhurst, Dixon and Victor placed Mr. Alli in apprehension of immediate harm and/or offensive touching.

242.    These Defendants thereafter engaged in and subjected Plaintiff to immediate harmful and/or offensive touching, giving rise to an unlawful battery.

243.   These Defendants acted in clear violation of well-settled law, of which a reasonable person should have been aware, and are not entitled to a good faith defense or qualified immunity defense.

244.   As a proximate cause of such conduct, Mr. Alli sustained permanent loss of vision, hearing, other bodily injuries and emotional harm.

245.   This conduct violated Mr. Alli's clearly established rights and he is entitled to damages for such conduct.

## FOURTH CLAIM: CLAIM FOR NEGLIGENCE
### Against all Defendants

246.   Plaintiff repeats, re-alleges and incorporates by reference the Paragraphs above as if fully set forth herein with the same force and effect.

247.   At all times alleged herein, Defendants acted under color of state law in their capacity of DOC officers, employees, staff, and/or agents and were required to act with due care and in conformity with DOC standards and directives and with the United States Constitution.

248.   Assaulting Officers as well as Defendants Beharri, Bunton, Dunbar, Phillips, Rohr and Velez breached this duty by causing Mr. Alli's bodily injuries and/or deliberately denying, delaying or otherwise interfering with his access to appropriate medical care.

249.   Policy-making Defendants Agro, Armstead, Davis, Finkle, Finkelman, Hourihane, Lemon, Mulvey, Potler, Regan, Schriro, Simmons and Wolf breached this duty by failing to monitor, supervise, train, remove and discipline subordinate officers who were predisposed to committing the acts complained of herein.

250.   These Defendants acted in clear violation of well-settled law, of which a reasonable person should have been aware, and are not entitled to a good faith defense or qualified immunity defense.

251.    The negligence of these Defendants was the proximate cause of the injuries sustained by Mr. Alli and violated his clearly established rights.

252.    Plaintiff is entitled to damages for this conduct.

## FIFTH CLAIM: CLAIM FOR NEGLIGENT HIRING AND SUPERVISION
### Against Policy-making Defendants and the City

253.    Plaintiff repeats, re-alleges and incorporates by reference the Paragraphs above as if fully set forth herein with the same force and effect.

254.    At all times alleged herein, Defendants acted under color of state law in their capacity of DOC high-ranking officials and were required to act with due care in the hiring, monitoring, appointment, training and supervision of all DOC personnel, including the defendants referenced herein.

255.    The City and Policy-making Defendants failed to exercise due care in the hiring, monitoring, appointment, training and supervision of the employees within their charge, including Defendants Assaulting Officers and Defendants-Uniformed and Supervisory Officers.

256.    The City and Policy-making Defendants knew or should have known that Defendants Steward-Bowden, Alceus, Arkhurst, Beharri, Dixon, Dunbar, Phillips, Velez and Victor were unfit to serve their respective roles and had a propensity to engage in violent, unprovoked conduct against inmates and detainees.

257.    The negligence of Defendant City and Policy-making Defendants proximately caused Plaintiff's injuries and violated Mr. Alli's clearly established rights.

258.    These Defendants acted in clear violation of well-settled law, of which a reasonable person should have been aware, and are not entitled to a good faith defense or qualified immunity defense.

259.    Plaintiff is entitled to damages for this conduct.

## SIXTH CLAIM: CLAIM FOR CONSPIRACY
### Against Defendants Assaulting Officers, Defendants Banks, Beharri, Bunton, Caputo, Dunbar, Phillips, Rohr and Velez

260.    Plaintiff repeats, re-alleges and incorporates by reference the Paragraphs above as if fully set forth herein with the same force and effect.

261.    At all times alleged herein, Defendants acted under color of state law in their capacity of DOC officers, employees, staff, and/or agents.

262.    Defendants Steward-Bowden, Alceus, Arkhurst, Banks, Beharri, Bunton, Caputo, Dixon, Dunbar, Phillips, Rohr, Velez and Victor made an agreement to retaliate against Mr. Alli as punishment for filing grievances, complaining about officer misconduct and misbehavior during Steward-Bowden's tour.

263.    In furtherance of said agreement, these Defendants assaulted Mr. Alli, conducted a biased investigation and administrative hearing, denied Mr. Alli appropriate health care, and subjected him to heinous conditions of confinement.

264.    These Defendants acted in clear violation of well-settled law, of which a reasonable person should have been aware, and are not entitled to a good faith defense or qualified immunity defense.

265.    These actions proximately caused Mr. Alli's injuries and violated his clearly established rights.

266.    Mr. Alli is entitled to damages for this conduct.

## SEVENTH CLAIM: CLAIM FOR AIDING & ABETTING
Against Defendants Banks, Caputo and Uniformed & Supervisory Officers

267.    Plaintiff repeats, re-alleges and incorporates by reference the Paragraphs above as if fully set forth herein with the same force and effect.

268.    At all times alleged herein, Defendants acted under color of state law in their capacity of DOC officers, employees, staff, and/or agents.

269.    Defendants Banks, Beharri, Bunton, Caputo, Dunbar, Phillips, Rohr and Velez aided and abetted Assaulting Officers in subjecting Mr. Alli to excessive force by, amongst other things: (i) failing to carry out an adequate investigation; (ii) failing to provide a non-biased Hearing, (iii) failing to investigate and/or report Mr. Alli's allegations of excessive force; (iv) delaying, postponing or otherwise interfering with prompt medical care for injuries resulting from the Assault; and (v) preventing Mr. Alli from reporting the same by, amongst other things, denying him phone usage for no legitimate, non-punitive penological purpose.

270.    These Defendants shared the purpose of the principal Assaulting Officers, namely to punish, retaliate against and/or otherwise harm Mr. Alli in connection with prior complaints and grievances Mr. Alli filed against DOC officers and officials.

271.    These Defendants acted in clear violation of well-settled law, of which a reasonable person should have been aware, and are not entitled to a good faith defense or qualified immunity defense.

272.    This conduct violated Mr. Alli's clearly established rights and Plaintiff is entitled to damages for this conduct.

### EIGHTH: CLAIM FOR VICARIOUS LIABILITY
### UNDER RESPONDEAT SUPERIOR
Against City and Policy-making Defendants

273.    Plaintiff repeats, re-alleges and incorporates by reference the Paragraphs above as if fully set forth herein with the same force and effect.

274.    At all times alleged herein, Defendants acted under color of state law in their capacity of DOC officers, employees, staff, and/or agents.

275.    The acts of Assaulting Officers and Uniformed and Supervisory Defendants was intentional, willful and tortious and committed within the scope of their DOC employment and in furtherance of the City's interests.

276.    These acts proximately caused Mr. Alli's injuries and violated Mr. Alli's clearly established rights.

277.    Plaintiff is entitled to damages for this conduct.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff hereby prays for relief and demands judgment in his favor against defendants, as follows:

(i)     Compensatory damages in an amount to be determined at trial;

(ii)    Punitive damages against each defendant, except the City of New York, in any amount to be determined a trial;

(iii)   Public discipline and sanctioning of Assaulting Officers

(iv)    Award of reasonable attorneys' fees, costs and disbursements of this action;

(v)     Award of Pre- and post-judgment interest, as permitted by law; and

(vi)    Granting such other and further relief as this Court deems just and proper.

46

## DEMAND FOR JURY TRIAL

278.   Plaintiff demands a trial by jury.

Dated:      New York, New York
            May 3, 2013                    WINSTON & STRAWN LLP

                                    By: _____
                                           Bianca M. Forde (bforde@winston.com)
                                           200 Park Avenue
                                           New York, New York 10166
                                           (212) 294-4733

                                           Attorney for Plaintiff
                                           *Umar Alli*

## CERTIFICATE OF SERVICE

I, BIANCA M. FORDE, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that on May 3, 2013, PLAINTIFF'S THIRD AMENDED COMPLAINT AND ALL EXHIBITS THERETO were served, by mail, upon the following DEFENDANTS:

1. Charlton Lemon, by delivery a copy to this Defendant at c/o New York City Department of Correction, Legal Division, Bulova Building, 75-20 Astoria Boulevard, East Elmhurst, New York 11370.

2. Rose Agro, by delivering a copy to this Defendant at c/o New York City Department of Correction, Legal Division, Bulova Building, 75-20 Astoria Boulevard, East Elmhurst, New York 11370.

3. Johanna Banks, by delivering a copy to this Defendant at c/o New York City Department of Correction, Legal Division, Bulova Building, 75-20 Astoria Boulevard, East Elmhurst, New York 11370.

4. Joseph Caputo, by delivering a copy to this Defendant at c/o New York City Department of Correction, Legal Division, Bulova Building, 75-20 Astoria Boulevard, East Elmhurst, New York 11370.

5. B. Behari, by delivering a copy to this Defendant at c/o New York City Department of Correction, Legal Division, Bulova Building, 75-20 Astoria Boulevard, East Elmhurst, New York 11370.

6. Correction Officer Bunton, by delivering a copy to this Defendant at c/o New York City Department of Correction, Legal Division, Bulova Building, 75-20 Astoria Boulevard, East Elmhurst, New York 11370.

7. Correction Officer Velez, by delivering a copy to this Defendant at c/o New York City Department of Correction, Legal Division, Bulova Building, 75-20 Astoria Boulevard, East Elmhurst, New York 11370.

8. Correction Officer Phillips, by delivering a copy to this Defendant at c/o New York City Department of Correction, Legal Division, Bulova Building, 75-20 Astoria Boulevard, East Elmhurst, New York 11370.

9. Correction Officer Rohr, by delivering a copy to this Defendant at c/o New York City Department of Correction, Legal Division, Bulova Building, 75-20 Astoria Boulevard, East Elmhurst, New York 11370.

10. Captain Sherma Dunbar, by delivering a copy to this Defendant at c/o New York City Department of Correction, Legal Division, Bulova Building, 75-20 Astoria Boulevard, East Elmhurst, New York 11370.

11. Mark A. Scott, by delivering a copy to this Defendant at c/o New York City Department of Correction, Legal Division, Bulova Building, 75-20 Astoria Boulevard, East Elmhurst, New York 11370.

12. Larry Davis, by delivering a copy to this Defendant at New York City Department of Correction, Legal Division, Bulova Building, 75-20 Astoria Boulevard, East Elmhurst, New York, 11370.

13. Michael Hourihane, by delivering a copy to this Defendant at New York City Department of Correction, Legal Division, Bulova Building, 75-20 Astoria Boulevard, East Elmhurst, New York, 11370.

14. Dora B. Schriro, delivering a copy to this Defendant at New York City Department of Correction, Office of the Commissioner, 75-20 Astoria Blvd, East Elmhurst, New York 11370.

15. Lewis Finkelman by delivering a copy to this Defendant at New York City Department of Correction, Legal Division, Bulova Building, 75-20 Astoria Boulevard, East Elmhurst, New York, 11370.

16. Michael J. Regan by delivering a copy to this Defendant at New York City Board of Correction, 51 Chambers Street, Room 923, New York, New York 10007.

17. Hildy J. Simmons, by delivering a copy to this Defendant at New York City Board of Correction, 51 Chambers Street, Room 923, New York, New York 10007.

18. Kennith T. Armstead, Sr. by delivering a copy to this Defendant at New York City Board of Correction, 51 Chambers Street, Room 923, New York, New York 10007.

19. City of New York, by delivering a copy to this Defendant at 120 Broadway, 4th Floor, New York, New York 10271.

Dated:      New York, New York
            May 3, 2013

BIANCA M. FORDE
Counsel for Plaintiff, *Umar Alli*

NY:1555458.1