# Exhibit B

CHAPTER 3
HEALTH CARE MINIMUM STANDARDS

**CONTENTS**

Section 3-01  Service Goals and Purpose
Section 3-02  Access to Health Care Services
Section 3-03  Training and Continuing Education
Section 3-04  Screening
Section 3-05  Pharmaceutical Services
Section 3-06  Treatment
Section 3-07  Records
Section 3-08  Privacy and Confidentiality
Section 3-09  Quality Assurance
Section 3-10  Inmate Death
Section 3-11  Disaster Plan
Section 3-12  Shackling of Inmates
Section 3-13  Variances
Section 3-14  Effective Date
Section 3-15  Implementation Dates

§3-01 **Service Goals and Purposes.**

(a)     *Purpose.*

> (1)     The following minimum health care standards are intended to insure that the quality of health care services provided to inmates in New York City correctional facilities is maintained at a level consistent with legal requirements, accepted professional standards and sound professional judgment and practice.

> (2)     These standards shall apply to health services for all inmates in the care and custody of the New York City Department of Correction (DOC), whether in City correctional facilities or at other health care facilities.

(b)     *Service Goals.*

Services for the detection, diagnosis and treatment of medical and dental disorders shall be provided to all inmates in the care and custody of the New York City Department of Correction.  The Department of Correction and the Health Authorities in consultation with the Department of Health (DOH) and the

1

Health and Hospitals Corporation (HHC) shall design and implement a health care program to provide the following:

(1)  Medical and dental diagnosis, treatment and appropriate follow-up care consistent with professional standards and sound professional judgment and professional practice;

(2)  Management and administration of emergency medical and dental care;

(3)  Regular training and development of health care personnel and correctional staff as appropriate to their respective roles in the health care delivery system; and

(4)  Review and assessment of the quality of health service delivery on an ongoing basis.

(c)  *Definitions.*

(1)  "Health Authority" shall refer to any health care body designated by New York City as the agency or agencies responsible for health services for inmates in the care and custody of the New York City Department of Correction. When the responsibility is contractually shared with an outside provider this term shall also apply.

(2)  "Health care personnel" refers to professionals who meet qualifications stipulated by their profession and who possess all credentials and licenses required by New York State law. "Medical personnel" refers to physicians, physician assistants and nurse practitioners.

(3)  "Sick-call" refers to an encounter between an inmate and health care personnel for the purpose of assessing and/or treating an inmate's medical complaint.

(4)  "Emergency" medical or dental care refers to care for an acute illness or an unexpected health need that cannot be deferred until the next scheduled sick call or clinic without jeopardy to the inmate's health or causing undue suffering.

(5)  "Special needs" refers to inmates requiring chronic care (see definition 6), convalescent care (definition 7) or skilled nursing care.

(6)  "Chronic care" is service rendered to an inmate over a long period of time. Treatment for diabetes, hypertension, asthma, and epilepsy are examples thereof.

(7)     "Convalescent care" refers to services rendered to an inmate to assist in the recovery from illness or injury.

(8)     "Health record" refers to a single medical record that contains all available information pertaining to an inmate's medical, mental health and dental care.  Unless otherwise specified, this record refers to a jail-based health record, not the hospital record, which is separate.

(9)     "Chief Correctional Officer" refers to the highest ranking correctional official assigned to a facility (usually a warden).

(10)    "Facility" refers to any jail which operates as its own command or to any jail annex which is not within walking distance of the parent facility.

(11)    "Flow sheet" refers to a document which contains all clinical and laboratory variables on a problem in which data and time relationships are complex (e.g., sequential fasting blood sugars in the diabetic inmate).

## §3-02 Access to Health Care Services.

(a)     *Policy.*

The Department of Correction and the Health Authority shall be responsible for the design and implementation of written policies and procedures which ensure that all inmates have prompt and adequate access to all health care services. Services must be available, consistent with §1-01 of the Minimum Standards for New York City Correctional Facilities.

(b)     *Access to care.*

(1)     Every facility must inform all inmates of their right to health care and the procedures for obtaining medical attention, as described in §3-04(b)(6).

(2)     No inmate may be punished for requesting medical care or for refusing it.

(3)     Under no circumstances shall an inmate's access to any health care service, including but not limited to those services described in these standards, be denied or postponed as punishment.

(4)     Correctional personnel shall never prohibit, delay, or cause to prohibit or delay an inmate's access to care or appropriate treatment.  All decisions regarding need for medical attention shall be made by health care personnel.

(5)     Inmates shall not be discriminated against with regard to treatment, on the basis of their medical diagnoses.

(6)     Any correctional personnel who knows or has reason to believe that an inmate may be in need of health services shall promptly notify the medical staff and a uniformed supervisor.

(7)     Staffing levels in the jail clinics, jail infirmaries and prison hospital wards shall be adequate in numbers and types to insure that all standards described here are met. "Staffing levels" refers to both clinical and correctional personnel.

(8)     The Health Authority shall develop policies and procedures to insure that inmates have access to second medical opinions regarding clinical recommendations.

(c)     *Sick Call.*

(1)     Sick-call shall be available at each facility to all inmates at a minimum of five days per week within 24 hours of a request or at the next regularly scheduled sick-call. Sick-call need not be held on City holidays or weekends. Facilities with capacities of over 100 people must provide sick-call services on-site in medical treatment areas. (As defined in subdivision (b) of §3-06).

(2)     Sick-call is to be conducted by a physician or under the supervision of a physician.

   (i)     correctional personnel shall not prevent or delay, or cause to prevent or delay an inmate's access to medical or dental services.

   (ii)    correctional personnel will not diagnose any illness or injury, prescribe treatment, administer medication other than that described in §3-05(b)(2)(iii), or screen sick-call requests.

(3)     Requests for access to health services shall not be denied based on any prior requests.

(4)     The Department of Correction shall provide sufficient security for inmate movement to and from health service areas.

(5)     Adequate records shall be maintained daily which are distinguishable by housing area on a form developed by the Department of Correction. These records shall be maintained for at least three years. The form shall include the following:

4

(i)      the names and number of inmates requesting sick call;

(ii)     the names and numbers of inmates arriving in the  clinic;  and

(iii)    the names and number of inmates seen by health care personnel.

(6)   The use of a sick-call sign up sheet shall not preclude the use of sick-call by inmates who are not on the list.

(d)   *Emergency Services.*

(1)   All inmate requests for emergency medical or dental attention shall be responded to promptly by medical personnel.  This shall include a face to face encounter between the inmate requesting attention and appropriate health care personnel.  All health care and correctional personnel must be familiar with the procedures for obtaining emergency medical or dental care, with the names and telephone numbers of people to be notified and/or contacted readily accessible.

(2)   Correctional personnel who know or have reason to believe that an inmate is in need of emergency health services shall make the appropriate notifications pursuant to paragraph (5) of this subdivision.

(3)   The Department of Correction, with the advice and agreement of the Health Authority, shall prepare and implement written policies and defined procedures which shall be posted in every facility and include arrangements for, at least, the following:

(i)      emergency evacuation of an inmate from the facility when required;

(ii)     use of an appropriate emergency medical vehicle;

(iii)    use of a designated hospital emergency unit;

(iv)     security procedures for the immediate transfer of inmates when necessary; and

(v)      procedures for providing for transfer of inmates within time guidelines established by the Health Authority.

(4)   Any correctional facility with a rated capacity of less than 100 inmates must have an agreement with one or more health care providers to provide emergency medical services and must have at least one correctional personnel on each housing unit certified in cardio-pulmonary resuscitation (CPR).

(5)    All uniformed correctional personnel shall be informed of and familiar with all written procedures pertaining to emergency health services.

(6)    In each facility, the telephone numbers of the control room and the medical clinic shall be posted prominently at each correctional officer station.

(7)    Medical personnel, with current CPR certification, trained in the provision of emergency health care shall be present at all times in each facility that has a rated capacity of 100 or more inmates. Whenever possible, health care personnel should be trained and certified in CPR.

(8)    In the case of serious illness or injury to an inmate, all reasonable attempts shall be made by the Department of Correction to notify the next of kin or legal guardian of the inmate within the time frames established for reporting unusual incidents.

(9)    The Health Authority shall determine the types and quantities of emergency equipment and supplies required to be available within each correctional facility in order to provide adequate emergency services and shall have written protocols regarding emergency care. An inventory shall be submitted to the Board of Correction within 90 days of implementation of the standards and updated annually or more frequently as determined by the Health Authority.

    (i)    all emergency health equipment and supplies shall be inventoried and inspected by health services personnel at least twice each year, or more frequently as determined necessary by the Health Authority to ensure that such equipment and supplies are in good working order.

    (ii)    all emergency equipment and supplies shall be easily accessible to appropriate personnel.

(10)    A uniform logbook shall be designed and used by the Department of Correction to document all requests for emergency health care. This logbook shall be maintained in the clinic and shall contain, but not be limited to the following information:

    (i)    name, commitment number/book and case number, housing location of the inmate, and the location of the incident;

    (ii)    the date and time of referral and the referring officer;

    (iii)    the time of inmate arrival in clinic or in the event that medical

personnel respond to an area outside of the clinic, the time medical personnel leave the clinic; and

    (iv)    the time the inmate is examined by health care personnel.

(e)    *Infirmaries.*

    (1)    Infirmaries, with discrete nursing stations and treatment area(s), shall be utilized to provide overnight accommodations and health care services of limited duration to inmates in need of close observation or treatment of health conditions which do not require hospitalization.  Housing areas shall not be used for a combination of general population and infirmary housing at any one time.

    (2)    At designated facilities, the Health Authority and Department of Correction shall develop and implement written policies and procedures for the management of infirmaries that are consistent with professional standards and legal requirements.  Such procedures shall incorporate at least the following:

    (i)    allocation of space and beds to meet the needs of the inmates in DOC custody as determined by the Health Authority and other applicable regulatory agencies;

    (ii)    accommodations for providing appropriate emergency services and the timely transfer of inmates to hospitals and specialty services as consistent with paragraphs (d)(3), (f)(1) and (f)(2) of this section; and

    (iii)    provision of adequate space and physical plant to operate infirmary related services (such as communicable disease isolation where applicable).

    (3)    The Health Authority shall develop and implement written policies that incorporate the following:

    (i)    maintenance and inventory of sufficient supplies, material, and equipment to provide proper and timely services to inmates;

    (ii)    clinical criteria for determining the eligibility of inmates for infirmary housing;

    (iii)    appropriate methods for a daily evaluation of the medical condition of each inmate;

(iv)     supervision of the infirmary 7 days per week, 24 hours per day by nurses, and other health care personnel as sufficient to meet the established needs of the inmates; and

(v)     availability of an adequate number of medical personnel 7 days per week, 24 hours per day to provide appropriate coverage, including daily rounds on infirmary patients.

(4)     Only health care personnel shall determine, after an examination of the inmate, if an inmate's condition necessitates admission to the infirmary.

(i)     inmates shall be discharged from the infirmary only upon the written authorization of medical personnel.

(ii)     correctional personnel shall not interfere with an inmate's access to infirmary services or the duration of confinement in the infirmary and shall transfer inmates to and from infirmaries promptly when so requested by health care personnel.

(5)     Infirmaries shall be designed and staffed so that inmates confined therein are within the sight or sound of health care personnel at all times.

(6)     Adequate records for each infirmary admission, evaluation, and discharge shall be maintained as part of each inmate's health record as consistent with applicable requirements of subdivisions (b) and (c) of §3-07.

(7)     Sufficient security measures shall be provided continuously in the infirmary to assure the health and safety of all inmates and health care personnel who provide services to such inmates.

(f)     *Outpatient Specialty Clinics.*

(1)     Outpatient specialist services shall be provided to inmates in time frames specified by the referring medical personnel upon the written determination of a physician or dentist that the treatment appropriate to the inmate's health care need is not available in the correctional facility or cannot adequately be provided at such facility.  In the event that the inmate has previously been treated by the specialty clinic physician, the specialty clinic physician shall determine the medically appropriate time for the return visit(s).

(i)     In instances where the specialty clinic physician determines the time period or date for a follow-up appointment, the jail-based physician may alter that time provided that the change in time is not medically inappropriate and shall inform the inmate of the proposed

8

change.  If the change is not medically required, the new appointment date shall be scheduled for the next available clinic, or in the alternative, shall not be scheduled for a time period greater than the original time period (for example, if the original appointment was scheduled for within one week, the rescheduled appointment can not be more than one week from the original appointment).

(ii)     The reasons for any change in the original plan must be indicated in the inmate's medical record with clear reasons for the change.

2)     The Health Authority and the Department of Correction shall devise a written plan for the timely delivery of inmates to specialty clinics.  This plan shall include, but not be limited to, the following procedures:

(i)     maintenance of a current list of community clinics approved by the Health Authority which can adequately provide specialist care and treatment;

(ii)    the scheduling requirements for specialist services and the hours of operation;

(iii)   the use of an appropriate vehicle for the timely  transfer of inmates to and from specialty clinics;

(iv)    security procedures and escort requirements appropriate for transferring the inmate to and from the outpatient health clinic, including shackling procedures which are medically appropriate; and

(v)     the transfer of appropriate health records and/or other pertinent information to assure proper follow-up care for the inmate, and to avoid unnecessary duplication of tests and examinations, pursuant to §3-08(c)(7).

(3)    The variety of outpatient services available to inmates shall be no different than those available to civilian patients.

(4)    Correctional or health care personnel shall not deny or unreasonably delay, or cause to deny or unreasonably delay an inmate's access to specialty services at any outpatient clinic.

(i)     sufficient Escort Officers shall be provided within the clinic or hospital to ensure that an inmate's access to specialty clinics and related diagnostic units is not denied or unreasonably delayed.

(g)    *Medical Isolation.*

(1)    Inmates in medical isolation will receive the same rights, privileges and services set forth in these standards for inmates not in isolation, provided that the exercise of such rights, privileges and services does not pose a threat to the health, safety, or well being of any other inmate, correctional staff or health care personnel.  Access to rights, privileges and services of and procedures regarding inmates in segregation for mental health observation is governed by the Board of Correction Mental Health Minimum Standards for New York City Correctional Facilities.

(2)    Medical personnel shall assess the condition of each inmate so segregated at least once each 24 hour period.  At least once each week rounds on all segregation inmates must be made by a physician.

(3)    Health care personnel must maintain a daily log that includes the name of medical personnel who made rounds on inmates in isolation and lists those inmates who required further attention in the clinic.  These logs are the property of the Health Authority and subject to the confidentiality provisions described in §3-08(c).  Medical services provided to individual inmates must be noted in the inmates' health records.

(4)    Upon request of the medical staff, inmates requiring further medical evaluation outside of the housing area shall be escorted to the clinic promptly for medical attention.

(5)    The Health Authority shall develop written policies and procedures regarding the care of inmates in medical isolation.  These procedures shall include that an inmate may be placed in medical isolation only upon the determination of medical personnel that isolation of an inmate is the only means to protect other people from a serious health threat, subsequent to the examination of such inmate and pursuant to §3-06(l)(2). This disposition by the medical personnel shall be in writing in the health care record and shall state:

(i)   the name of the inmate; and

(ii)  the facts and medical reasons for the isolation;

(iii) the date and time of isolation;

(iv) the duration of isolation, if known; and

(v) any other special precautions or treatment deemed necessary by

10

the medical personnel.

Upon determination by a physician that an inmate in medical isolation no longer presents a serious threat to the health of any person, that inmate shall be released from such special housing after the appropriate correctional personnel are advised.

(h)   *Special Needs.*

    (1)   The Health Authority in consultation with other agencies as required will develop written policies and defined procedures insuring appropriate care of inmates with special needs requiring close medical supervision, including chronic care and convalescent care or skilled nursing care.

    (2)   A written treatment plan, developed by the health care provider, supervised by medical personnel, must exist for each special needs inmate. The plan, to be included in the health record, may include but need not be limited to instructions about diet, exercise, medication, the type and frequency of laboratory and diagnostic testing, and the frequency of follow-up for medical evaluation and adjustment of treatment modality.

    (3)   When clinically appropriate, the treatment plan shall prescribe inmate access to the range of supportive and rehabilitative services (such as physical therapy and rehabilitation therapy) that the treating medical personnel deems appropriate.

    (4)   Rehabilitation services shall be available at in-jail clinics or through the outpatient clinics at off-site facilities, as appropriate.

(i)   *Hospital Care.*

    (1)   Hospital based care shall be provided for inmates in need of hospital care consistent with applicable sections of the State Health Code. The Health Authority in conjunction with the Department of Health, Health and Hospitals Corporation, and other relevant providers, shall have a written plan defining admission and discharge procedures for appropriate levels of care. These procedures shall ensure that inmates are not transferred to and from health care settings unnecessarily.

    (2)   Services provided to inmates in acute care, chronic care or other non-jail health facilities must meet all applicable subdivisions of these standards.

(j)   *Punitive Segregation.*

    (1)   The Health Authority shall develop policies and procedures governing the

11

medical attention for inmates in punitive segregation.  These policies shall include the requirements of paragraphs (g)(2-4).  In addition, upon determination by a physician that the health of an inmate in punitive segregation will be adversely affected by such housing, the inmate shall be released from punitive segregation housing after the appropriate correctional personnel is advised.

§ 3-03 **Training and Continuing Education.**

(a)      *Policy.*

There shall be a written program for the orientation, training and continuing education of correctional and health care personnel to ensure the employment or assignment of qualified personnel and the continuous delivery of quality health care.

(b)      *Health Care Personnel.*

(1)      The Health Authority shall be responsible for the following:

(i)      ensuring that all health service professionals are appropriately credentialed;

(ii)     monitoring verification of continued maintenance of licensure and/or certification of professional health care personnel, including participation in continuing education programs as required by their professions.

(2)      Written job descriptions approved by the Health Authority shall define the specific duties and responsibilities of health care personnel who provide health care in the facilities.  Such job descriptions shall be reviewed on a periodic basis as determined by the Health Authority, but never to exceed one year.

(3)      The following shall only be performed by health care personnel and shall not be performed by correctional personnel or inmates, except as provided under §3-05(b)(2)(iii):

(i)      providing direct patient care services;

(ii)     scheduling health care appointments;

(iii)    determining access of (other) inmates to health care services;

(iv)     handling of unsealed health records except in medical emergency

12

situations and only upon the request of health care personnel;

(v)     handling or having access to surgical instruments, syringes, needles, medications;  or

(vi)     operating medical equipment.

(c)    *Training.*

(1)     A written plan developed by the Health Authority shall require all health care personnel to participate in orientation and training appropriate to their specific health care delivery activities and job descriptions, and required by their respective disciplines and licensing bodies.  This shall include training in mental health screening as described in the Mental Health Minimum Standards.  The plan shall define the frequency of ongoing training for all health care personnel.

(2)     Written policy and a training program for correctional staff shall be established and approved jointly by the Health Authority and the Department of Correction determining the type of training for new staff and the type and frequency of training and continuing education for all correctional staff regarding, but not limited to, instruction in the following:

(i)     how to recognize medical emergencies;

(ii)     administration of first aid and certification in cardio-pulmonary resuscitation (CPR) for sufficient staff to meet the standard described in the Mental Health Minimum Standards;

(iii)     how to obtain medical care for inmates in emergency and non-emergency situations;

(iv)     rules and regulations regarding health services and the layout of each facility in which they work.

(3)     The Department of Correction will ensure that the correctional staff are trained in those areas described in paragraph (c)(2) of this section.

§3-04 **Screening.**

(a)   *Policy.*

Screening procedures shall be developed and implemented which promote timely identification of immediate needs of the inmate and of public health concerns for the institution.  The initial screening shall also establish a medical baseline for ongoing care.

(b)   *Intake Screening.*

(1)   Screening for health purposes is to be performed on all inmates upon their arrival at the initial receiving correctional facility.  Screening shall be conducted by medical personnel prior to housing.

(2)   The Health Authority shall develop written policies and procedures determining the topics to be reviewed during intake screening.  Such review shall include but not be limited to the following:

(i)   a history of present illnesses and past medical history including dental, vision, mental health and hearing problems, an immunization history, as well as communicable diseases such as venereal disease and tuberculosis;

(ii)   a drug history inquiring into the use of alcohol and other addictive substances including types of drugs used, mode of use, amounts used, date of last use and a history of problems which may have occurred after ceasing use, such as convulsions;

(iii)   inquiry into and, where appropriate, verification of medication taken and special treatment requirements and planned procedures for inmates with significant health problems;

(iv)   recording of height, weight, pulse, blood pressure, temperature;

(v)   physical examinations and administering of tests held to be appropriate by the screening medical personnel, including but not necessarily limited to:

(a)   tuberculin skin test, if no history of prior positive reaction; if positive, to be followed by chest x-ray;

(b)   urinalysis dipstick test for glucose, ketones, blood, protein, and bilirubin;

(c)   serologic test for syphilis;

14

(d)     gonorrhea culture for men if clinically appropriate, and gonorrhea and chlamydia screening for all women;

(e)     rectal exams for all inmates over 40 years old; and

(f)     appointments for baseline EKGs will be scheduled within two weeks of admission for all inmates over 40 years old who do not have clinical indications for EKG at time of admission.

(vi)    observation of behavior which includes alertness, orientation, mood, affect, apparent signs of drug/alcohol withdrawal, and suicidal and homicidal ideation;

(vii)   observation of body deformities and ease of movement;

(viii)  observation of condition of skin, including trauma, major and/or unusual markings, bruises, lesions, jaundice, rashes and infestations, and needle marks or other indications of drug abuse;

(ix)    observation of other health problems as designated by the screening physician or Health Authority; and

(x)     obstetrical and gynecological histories, pap smears and pregnancy tests for women.

(3)     The results of each inmate's screening examination shall be reviewed by health care personnel and mental health staff when appropriate, and one of the following actions shall be taken:

(i)     referral to an appropriate health care service on an emergency basis; or

(ii)    clearance for housing with follow-up scheduled later with the appropriate health care service, if required; or

(iii)   placement in specialized housing such as infirmary or mental observation.  A referral to mental observation housing shall be reviewed by mental health staff on the next tour that mental health staff are on-site.

(4)     Intake screening for transfers may be limited to a review of the previous screening results by health care personnel, but must be completed prior to housing. A full screening need not be conducted except where any of the following apply:

(i)     a copy of the previous intake screening form does not accompany

15

the transferee's arrival, or is lost or illegible;

(ii)   the accompanying form is not in compliance with standard format or procedures as determined by the Health Authority pursuant to §3-07(b); or

(iii)   medical personnel reviewing the chart determines an inmate must be seen.

(5)   Initial intake screening results shall be recorded on a standard printed form approved by the Health Authority.

(6)   At the time of intake, all inmates shall receive written communication to be approved by the Health Authority, and written and distributed by DOC in English and Spanish, describing available medical and dental services, the confidentiality of those services and the procedures for gaining access to them.

(i)   the Department of Correction shall make provisions to assure that procedures for gaining access to medical and dental services are verbally explained to illiterate inmates and that inmates whose native language is other than English or Spanish are given prompt access to translators for the explanation of these procedures.

(7)   The new admission intake screening must be completed within 24 hours of admission to DOC custody.  A designated person at the Health Authority and at the Department of Correction shall be notified in writing whenever a newly admitted inmate does not receive intake screening within 24 hours of admission to DOC.

§3-05 **Pharmaceutical Services.**

(a)   *Policy.*

Written policies and procedures pertaining to pharmaceutical services, that are consistent with professional practices and in accordance with all applicable federal, state and local laws, shall be established and implemented.

(b)   *Management.*

(1)   All written policies and procedures for the proper management of pharmaceuticals shall be established by the Health Authority in accordance with all applicable law.  This plan shall include, but not be limited to the following:

16

(i)     a formulary specifically developed for both prescribed and non-prescribed medications stocked by the facility;

(ii)    procedures which account for receipt, dispensation, distribution, administration, and disposal of medication;

(iii)   periodic inventory of controlled substances as defined by the Drug Enforcement Administration of the United States Department of Justice;

(iv)    periodic inventory of all other medication retained in a facility on a schedule established by the Health Authority to insure that medications do not expire;

(v)     appropriate security and storage of all medications and medical supplies including needles and syringes; and

(vi)    maintenance of adequate supply of all regularly used drugs.

(2)    Access to prescription medication shall be limited to only those persons with written authority of the Health Authority or those designated by them. Prescription medication for inmates shall be prescribed, dispensed and administered only by physicians, physician's assistants, nurse practitioners, nurses, pharmacists or other health care personnel properly trained and in compliance with State and federal law.

(i)     Prescription medication may be prescribed, dispensed and administered only when clinically indicated and consistent with a treatment plan.

(ii)    Controlled substances or drugs whose toxic dose is close to the therapeutic dose shall be administered in liquid or powdered form whenever possible and when clinically appropriate.

(iii)   Non-prescription analgesic medication may be distributed by Correction Officers in the housing areas in accordance with written guidelines approved by the Health Authority and the Department of Correction.

(3)    All administered medication shall be documented and maintained on records satisfactory to the Health Authority and shall consist of the following:

(i)     the name of the inmate;

17

(ii)     the name of the dispenser;

(iii)    the name of the prescriber;

(iv)     the name of the drug;

(v)      the time of day and date the medication is dispensed;

(vi)     the date the prescription expires;

(vii)    directions for administering the medication; and

(viii)   other information deemed necessary by the Health Authority to facilitate proper use.

(4)     All medication prescribed and dispensed to inmates shall be administered in accordance with the prescriber's written directions and only up to the expiration date of the specific item.  The Health Authority shall write policies and procedures that insure the prompt availability of non-fomulary drugs and continuity of medication between health service sites.

(5)     No inmate may be prescribed a controlled substance for more than two weeks unless determined to be necessary by a physician or authorized health care personnel after a thorough re-evaluation of the inmate's condition.  There shall be exceptions for 21 day methadone and 30 day phenobarbital protocols.

(6)     Written policies and procedures will be developed by the Department of Correction and the Health Authority to insure that inmates on medications can receive them if they are scheduled to be in court or at another facility at the time that medications are administered.

(7)     Policies and procedures, developed by the Health Authority shall be implemented to insure that inmates who refuse significant medications are counseled on the medical consequences of refusal.  Inmates must be offered subsequent administration if re-prescribed by medical personnel.

§3-06 **Treatment.**

(a)     *Policy.*

Adequate health care, including follow-up care, shall be provided to inmates in an environment which facilitates care and treatment.  Such care and treatment shall be provided by health care personnel in a timely fashion and shall be

18

consistent with accepted professional standards and legal requirements.

(b)   *Treatment Area.*

(1)   Each correctional facility with a capacity of over one hundred shall establish and maintain a discrete medical treatment area (clinic) which is in accordance with all State, federal, and local laws and all other applicable legal requirements, except where paragraph (5) of this subdivision applies.

(2)   The Health Authority shall establish written criteria defining the following:

(i)   the equipment, supplies and materials necessary in each clinic to provide quality health treatment and appropriate specialty care, where applicable; and

(ii)   the number of health care personnel required to provide effectively for the needs of the inmate population within appropriate time frames.

(3)   At a minimum, the medical treatment areas in each clinic shall be equipped with the following:

(i)   hot and cold running water in each exam room;

(ii)   adequate lighting in each exam room;

(iii)   an examination table;

(iv)   an appropriate receptacle for infectious waste in accordance with local laws;

(v)   sterilization equipment as needed;

(vi)   adequate space to provide privacy for all encounters between health care personnel and inmates;

(vii)   acceptable heating, air-conditioning and ventilation;

(viii)   soap and paper towels, and

(ix)   all other equipment, supplies, and materials deemed appropriate by the Health Authority pursuant to paragraph (2) of this subdivision.

(4)   Health care equipment, supplies, and materials shall be placed in an area

19

which is easily accessible to health care personnel.  Equipment used for treating inmates shall function properly and safely at all times.

(5)     Medical treatments or physical examinations shall not occur outside of appropriate treatment areas described by paragraphs (2) and (3) of this subdivision, except as needed in the event of an acute medical emergency.

(c)     *Dental Services.*

(1)     Quality dental care necessary to maintain an adequate level of dental health shall be available to each inmate under the direction and supervision of a dentist licensed in New York State.

(i)     emergency dental care shall be provided as described in §3-02(d).

(ii)     a dental examination shall be offered within three weeks for each inmate who so requests or upon referral by other health care personnel unless the inmate refuses the scheduled exam.  There shall be a follow-up plan developed to insure that necessary services are provided in a timely fashion. In-clinic refusals or no-shows shall be documented in the inmate's health record.

(iii)     the Department of Correction shall be responsible for ensuring that requests for access to non-emergency dental services are communicated to dental health care personnel within two working days of receipt by Department of Correction.  In the event that dental personnel are not on duty, an inmate's request will be communicated to health care personnel, who in turn will be responsible for conveying the request to dental personnel on their next work day.

(2)     A dental examination shall include, but not be limited to, the following:

(i)     an examination of the internal and external structure  of the mouth to detect abnormal functioning, diseases of the mucous membranes and jaws, and diseases of the teeth and supporting structures;

(ii)     diagnostic X-rays when deemed necessary by the dentist;

(iii)     testing of the pulp and other tissues;

(iv)     caries susceptibility;

(v)     cancer smears, as indicated;

(vi)    taking or reviewing a dental history and noting decayed, missing, and filled teeth; and

(vii)   education in proper dental hygiene.

(3)    Dental treatment, not limited to extractions, shall be provided when the health or comfort of the inmate would otherwise be adversely affected for an unreasonable length of time as determined by the dentist after reviewing the results of a dental examination.  Treatment may include, but not be limited to, the following:

      (i)     relief of pain and treatment of acute infections;
      (ii)    removal of irritating conditions which may lead to malignancies;
      (iii)   treatment of related bone and soft tissue diseases;
      (iv)   repair of injured or carious teeth;
      (v)    replacement of lost teeth and restoration of function;
      (vi)   oral prophylaxis;
      (vii)  endodontics;
      (viii) oral surgery; and
      (ix)   periodontics.

(4)    Dental treatment shall be conducted within a reasonable time as determined by the results of the dental examination.

(5)    A full health record must be available to the treating dentist at the time of treatment if requested by the dentist or deemed necessary by health care personnel.

(6)    Adequate dental records of each inmate's visit shall be maintained in the health record, including the following:

      (i)     date of the visit.
      (ii)    results of the dental examination;
      (iii)   treatment planned or provided where appropriate;
      (iv)   follow up plans if any; and
      (v)    name and signature of the dentist.

(7)    Only a dentist or a dental hygienist licensed to practice in New York State may conduct dental examinations. Only a dentist so licensed may provide dental treatment.

      (i)     correctional personnel will not screen requests for dental services.

      (ii)    no person shall deny or in any way delay an inmate's request for access to dental services.

(8)     A daily record or log shall be maintained by the Health Authority which lists the following:

    (i)     the names and number of inmate requests for dental services;

    (ii)    the names and number of inmates brought to the dental clinic; and

    (iii)   the names and number of inmates seen by dental personnel.

(d)     *Vision and Eye Care Services.*

(1)     The Health Authority shall establish written policies and procedures to provide vision and eye care services to inmates in need of such services.

    (i)     all inmates who in the opinion of medical personnel require vision and eye care services beyond that which is provided during the intake screening, shall be so referred and provided.

    (ii)    inmates whose eyeglasses are broken, lost, or otherwise unavailable shall be entitled to a vision examination.

(2)     If determined after an eye examination that an inmate is in need of eyeware, the Health Authority shall be responsible for providing the inmate with such eyeware.

(3)     All incoming inmates who are in possession of corrective eyeware shall be allowed to retain such unless otherwise determined by health care personnel.

(4)     Records shall be maintained in the inmate's medical chart of all ophthalmologic, optometric, and vision services.  Such records will include at least the following:

    (i)     results of vision examinations conducted in addition to initial screening;

    (ii)    treatment or medication prescribed and follow-up plans; and

    (iii)   the name of the treating ophthalmologist/optometrist.

(5)     A daily log shall be maintained by the Health Authority to document the following:

    (i)     the names and number of inmates referred to or requesting vision and eye care services; and

    (ii)    the names and number of referrals and requests honored.

(6)  Eye and vision examinations and treatment shall be conducted only by an ophthalmologist or an optometrist licensed in New York State.

(e)  *Pregnancy and Child Care.*

(1)  All pregnant inmates shall receive comprehensive counseling, assistance, and medical care consistent with professional standards and legal requirements.

(2)  A pregnant inmate shall be provided with appropriate and timely prenatal and postnatal care including but not limited to the following:

(i)  gynecological and obstetrical care;

(ii)  medical diets for prenatal nutrition;

(iii)  all laboratory tests as deemed necessary by medical personnel; and

(iv)  special housing as deemed necessary by medical personnel.

(3)  Upon request, and in accordance with all applicable laws, female inmates shall be entitled to receive abortions in an appropriately equipped and licensed medical facility within a reasonable time-frame. The following conditions shall apply to abortion services at a hospital:

(i)  subsequent to consultation with a licensed physician, the voluntary informed consent of the inmate shall be obtained as pursuant to subdivision (j) of this section prior to the procedure; and

(ii)  the procedure shall not be performed in the correctional facility.

(4)  The Health Authority shall make all reasonable arrangements to ensure that child births take place in a safe and appropriately equipped medical facility outside of the correctional facility.

(5)  If an inmate decides to keep her child, necessary child care will be provided as consistent with applicable section(s) of the New York Correction Law and all other legal requirements and consistent with Department of Correction policies governing the nursery program.

(6)  Upon request, pregnant inmates shall be provided access to adoption or foster care services through the Department of Correction's Social Service Unit. Under no circumstances will correctional or health care personnel delay or deny an inmate access to such services or force an inmate to utilize either service against her will.

(i)     if the inmate decides on adoption or foster care for the new born child, referral services with the New York City Department of Social Services will be promptly provided for planning and placement of the infant.

(7)     The Health Authority and the Department of Correction shall insure that nursing mothers admitted to the Department of Correction are screened for eligibility for the nursery program with appropriate speed.  There shall be written policies and procedures defining the program and criteria for admission to and discharge, including grounds for removal from the program.

(f)     *Diagnostic Services.*

(1)     Written policies and procedures pertaining to diagnostic services, including radiology, pathology, and other medical laboratory services shall be developed and implemented by the Health Authority within the correctional facilities in accordance with legal requirements, accepted professional standards and sound professional judgment and practice.

(2)     Pathology and medical laboratory procedures and policy shall include, but not be limited to, the following:

(i)     conducting laboratory tests appropriate to the inmate's needs;

(ii)    performing tests in a timely and accurate manner;

(iii)   prompt distribution and review of test results and maintaining copies of results in the laboratory and in the inmate's health record;

(iv)    calibration of equipment on a periodic basis;

(v)     validation of test results through use of standardized control specimens or laboratories;

(vi)    receipt, storage, identification and transportation of specimens;

(vii)   maintenance of complete descriptions of all test procedures performed in the laboratory including sources of reagents, standards, and calibration procedures; and

(viii)  space, equipment and supplies sufficient for performing the volume of work with optimal accuracy, precision, efficiency, and safety.

(3)     Policies and procedures for the delivery of radiology services within the correctional facilities shall be established by the Health Authority and shall

include, but not be limited to, the following:

    (i)    appropriate radiographic or fluoroscope diagnostic and treatment services;

    (ii)   interpreting x-ray films and other radiographs, and supplying reports in a timely manner;

    (iii)  ·maintaining duplicate reports for services and retaining film in the radiology department for a period of time that is in accordance with all applicable laws;

    (iv)   maintaining an adequate record of all examinations performed on each inmate in a separate log and as part of the inmate's health record; and

    (v)    when appropriate, prompt referral to necessary off-site radiology services.

(4)    Safety issues regarding all radiology services shall be explained to all appropriate health personnel.  Policies and procedures addressing these aspects shall include, but not be limited to, the following:

    (i)    performing radiology services only upon the written order of medical personnel or a dentist which contains the reason for the procedure;

    (ii)   limiting the use of any radioactive materials to qualified health care personnel;

    (iii)   regulating the use, removal, handling, and storage of any radioactive material;

    (iv)   precautions against electrical, mechanical, and radiation hazards;

    (v)    instruction to health care and correctional personnel in safety precautions and in the handling of emergency radiation hazards;

    (vi)   proper shielding where radiation sources are used, acceptable monitoring devices for all personnel who might be exposed to radiation to be worn in any area with a radiation hazard, and the maintenance of records on personnel exposed to radiation; and

    (vii)  ongoing recorded evaluation of radiation sources and of all safety measures followed, in accordance with all federal, state, and local laws and regulations.

(5)     Pathology and radiology services shall be directed by qualified physicians licensed by New York State.

(6)     Inmates will be notified promptly of all clinically significant findings and appropriate follow-up evaluation and care will be provided.  This section applies to diagnostic service provided in all settings.

(g)     *Surgical and Anesthesia Services.*

(1)     Inmates shall be provided with access to adequate surgical and anesthesia services as defined in written policies and procedures developed by the Health Authority in accordance with legal requirements, accepted professional standards and sound professional judgment and practices.

(2)     Minor surgical and oral surgical procedures can be performed only by medical personnel or dentists with appropriate training and appropriate levels of back up services available.

(3)     The informed consent of the inmate must be obtained before an operation is performed, pursuant to subdivision (j) of this section.

(4)     The Health Authority shall provide observation and care for inmates during pre-operative preparation and post-operative recovery periods, and establish written instructions for inmates in follow-up care after surgery.

(5)     Surgical rooms, supplies, and equipment shall be properly cleaned and sterilized before and after each use.

(6)     Adequate surgical and anesthesia equipment and space will be available.

(i)     all equipment shall be calibrated, adjusted and tested regularly and so recorded to ensure proper functioning at all times.

(h)     *Medical Diets.*

(1)     Written policies and defined procedures shall be developed by the Health Authority and the Department of Correction and shall provide for special medical and dental diets which are prepared and served to inmates according to the written orders of the medical or dental personnel.

(2)     When determined by medical or dental personnel that an inmate's health condition necessitates a special therapeutic diet, the Department of Correction shall be responsible for providing such diets promptly.  Written records shall be maintained that identify the names of inmates receiving special diets, the date they are initiated, the duration and the specification

26

of the diets.

(3)   Requests for special diets or modifications of previous requests will be in writing, signed by medical or dental personnel and completely and specifically list the following:

    (i)   levels of applicable nutrients or calories desired;
    (ii)   types of and quantities of food groups allowed;
    (iii)   special preparation restrictions or requirements if any; and
    (iv)   duration of the diet.

(4)   Orders for special diets shall be recorded in the inmate's medical or dental record including:

    (i)   the purpose for such diet;
    (ii)   a description of the diet including duration; and
    (iii)   the signature of the dentist or physician ordering such diet.

(5)   Inmates who are in need of long-term therapeutic diets shall be given written dietary instructions specific to their diet modification by the Health Authority.

(6)   A Department of Correction registered dietician trained in the preparation of therapeutic diets shall be available for consultation to all facilities where food is prepared for inmates.  This registered dietician shall oversee the staff dieticians who will be available in sufficient numbers to insure that all relevant sections of these standards are met.

(7)   Special diets shall be available to inmates in general population and special housing.  Special housing shall not be required in order to receive special diets.

(i)   *Prosthetic Devices.*

(1)   Medical and/or dental prostheses shall be provided promptly by the Health Authority when it has been determined by the responsible physician and/or dentist that they are necessary, unless there is a reasonable basis to assume that the inmate will not be incarcerated for sufficient time to receive the prosthesis.

    (i)   prostheses shall include any artificial device to replace missing body parts or compensate for defective bodily functions;

    (ii)   the cost for prosthetic equipment and services shall be borne by the Health Authority.

(j)   *Informed Consent.*

27

(1)     Informed consent will always be sought by health care personnel.

(2)     When an invasive procedure is indicated and except as otherwise provided in paragraph (4) of this subdivision, an inmate shall be given complete information, in a language he/she understands, pertaining to the following:

> (i)     the inmate's diagnosis and the nature and purpose of the proposed medical or dental treatment;
>
> (ii)    the risks and benefits of the proposed treatment;
>
> (iii)   alternative methods of treatment, if any; and
>
> (iv)    the consequences of forgoing the proposed treatment.

(3)     Medical personnel or dentists shall not withhold any facts necessary for an inmate to make an informed, knowing decision regarding treatment, or minimize the risks of known dangers of a procedure in order to induce the inmate's consent.

(4)     The Health Authority shall develop and implement written policies and procedures pertaining to informed consent which will be submitted for approval to the Board of Correction within 90 days and must be consistent with all applicable laws.  The policies and procedures must include, but need not be limited to, the following:

> (i)     obtaining informed consent for inmates who are minors or others who are or may be legally incapable of providing informed consent;
>
> (ii)    use of a written form to document the informed consent of inmates for special procedures beyond routine treatment; and
>
> (iii)   maintenance of detailed documentation when special procedures or surgery are performed on inmates in emergency situations pursuant to paragraph (l)(3) of this section.

(5)     Informed consent forms shall be maintained as part of the inmate's health record in accordance with all applicable laws.

(6)     Informed consent policies shall be consistent with the informed consent policies described in the Board of Correction Mental Health Minimum Standards for New York City Correctional Facilities.

(k)     *Drug and Alcohol Treatment.*

(1)     All inmates who give empirical evidence of addiction to alcohol, drugs or both, must be observed and offered treatment to prevent complications resulting from intoxication, withdrawal and associated conditions, as appropriate and according to written protocols approved by the Health Authority.

(2)     Education and referral services should be available to inmates with alcohol or drug addiction(s) who request assistance.

(l)     *Right to Refuse Treatment.*

(1)     An inmate may refuse a medical examination or any medical treatment except when medical personnel or a dentist has determined that immediate medical, surgical or dental treatment is required to treat a condition or injury that may cause death, serious bodily harm, or disfigurement to such inmate and at least one of the following applies:

(i)     the inmate has been determined in accordance with all applicable laws to be incompetent to consent to the specific procedure at the time it is offered;

(ii)    consistent with the provisions of applicable law the inmate is a minor; or

(iii)   it is demonstrated that the parent or legal guardian of incompetent inmates or minors cannot be reached.

(2)     When an inmate refuses treatment for a health condition that is infectious, contagious, or otherwise poses a threat to the health, safety, or well-being of others, such inmate may, in accordance with determination made by health care personnel either:

(i)     be placed in medical isolation in compliance with subdivision (g) of §3-02; or

(ii)    be transferred to an infirmary setting.

(3)     When an inmate is treated against his or her will pursuant to paragraph (2) of this subdivision:

(i)     the medical personnel will use only those measures which in his or her best professional judgment are deemed appropriate in response to the emergency; and

(ii)    adequate health records shall be maintained to detail the inmate's condition, the threat the inmate poses to himself and others, and the specific reasons for the intervention.

29

(4)    An inmate who voluntarily refuses any health service deemed essential upon review by health care personnel shall do so after consultation with a Health Authority and shall sign a waiver form developed by the Health Authority.

   (i)    if the inmate refuses to sign a waiver, non-treating health care personnel shall sign the waiver as a witness, and note that the inmate has verbally refused such health services and refused to sign any waiver.

   (ii)    completed waiver forms shall be maintained as part of each inmate's health file in accordance with all applicable laws regarding duration of retention.

   (iii)    the waiver shall be specific to the procedure or care being refused and must be accompanied by a detailed and documented discussion of the procedure/treatment being refusal and medical consequences of refusal and cannot be used to deny or fail to offer the inmate subsequent  treatment.

   (iv)    Whenever required by medical personnel and practicable, all refusals for specialty clinics should be signed in the presence of medical personnel before the inmate is scheduled for transfer to the specialty clinic.

(5)    Inmates refusing treatment need not remain in a medical area unless their condition, without treatment, cannot be managed in a less intensive setting.

(6)    The policies developed regarding the right to refuse treatment shall be consistent with the Mental Health Minimum Standards.

(7)    Care rendered under paragraphs (1) or (3) of this subdivision or care refused as described in paragraph (4) of this subdivision shall be recorded in a log specifically maintained for this purpose. The log which shall be maintained by the Health Authority in each clinic shall have sequentially numbered pages, and must at a minimum indicate the name and number of the inmate refusing care or being treated against his/her will, the name(s) of the health care personnel involved and a description of the event.  This log shall be reviewed by medical personnel designated by the Health Authority on a daily basis.  Nothing in this subdivision shall alter the requirements for appropriate documentation in the health care record.

(m)    *Acquired Immune Deficiency Syndrome.*

   (1)    The Department of Correction and the Health Authority shall develop

policies and procedures to insure that inmates with HIV disease are treated in a non-discriminatory manner. These policies shall state that discrimination against any inmate based on his/her diagnosis or unauthorized disclosure of HIV-related information will result in disciplinary action by the relevant agency.

(2)     The Health Authority shall develop protocols for the prevention and treatment of HIV-related illnesses that are consistent with accepted professional standards and sound professional judgment and practice. All practices affecting the treatment or care of people with HIV infection shall be in compliance with federal, state and local laws and with all other parts of these standards.

(3)     *Confidentiality.* All services for HIV-related disease shall be provided in a manner that insures confidentiality, consistent with these standards and New York State law. Segregation based solely upon this diagnosis shall be prohibited.

(4)     *Testing.* Testing for HIV infection will be voluntary and performed only with specific informed consent and appropriate pre- and post-test counseling.

(5)     *Education.* There shall be comprehensive AIDS education for all inmates and personnel who work in Department of Correction facilities and on the hospital prison wards. The curriculum shall be reviewed by the Health Authority, and revised as new information and treatments become available. Education services shall be provided by the Department of Health, the Department of Correction, Health and Hospitals Corporation or their designees. The Health Authority and the Department of Correction shall maintain a schedule of training sessions which includes the number of people in each session which shall be available for review by the Board of Correction.

## §3-07 Records.

(a)     *Policy.*

(1)     The Health Authority shall design and implement written policies and procedures for the maintenance of medical and dental records for use in correctional facilities which are:

(i)      documented accurately, legibly, and in a timely manner; and
(ii)     readily accessible to health care personnel.

(2)     Records for inmates who are treated at the hospital shall comply with the legal requirements of the hospitals' accrediting agent(s).

(b)    *Format and Contents.*

    (1)    The Health Authority shall approve uniform medical and dental forms for the recording of health information at all Department of Correction facilities.

    (2)    A health record shall be established and maintained for each inmate. At a minimum, the health record file shall contain, but not be limited to, the following:

        (i)    the completed intake screening form, as described in subdivision (b) of §3-04;

        (ii)    a problem list;

        (iii)    place, date, time, and the type of health service provided at each clinical encounter;

        (iv)    all findings, diagnoses, treatments, dispositions, recommendations, and summary of instructions to inmates;

        (v)    prescribed medications, their administration, and the duration;

        (vi)    original or copies of original laboratory, x-ray, and other diagnostic studies;

        (vii)    signature and title of each health care provider shall accompany each chart note;

        (viii)    completed consent and refusal forms;

        (ix)    release of information forms signed by the inmate;

        (x)    special diets and other specialized treatment plans;

        (xi)    clinical and discharge summaries when an inmate is treated outside of Department of Correction facilities;

        (xii)    health service reports of medical and dental treatments, examinations, and all consultations pertaining to such services; and

        (xiii)    flow sheets for all infirmary or chronic patients.

    (3)    The health record shall accompany each inmate whenever he or she is transferred to another New York City Department of Correction institution. The health record, or a copy of the record, or pertinent sections of the

record shall accompany each inmate whenever he or she is treated in a specialty clinic within a Department of Correction facility upon request of the specialty clinic physician.

(4)   When an inmate is treated at a specialty clinic in a municipal hospital or other off-site health care facility, a detailed consultation request containing significant data, lab results and all relevant medical history shall accompany each inmate.  When specialists at any off-site facility require the complete medical record, there shall be a written procedure in place to allow for the confidential transfer and return of this record or a copy of the record.

(c)   *Retention of Institutional Records.*

(1)   At a minimum the Health Authority shall be responsible for the following:

(i)   safeguarding all health records from loss, tampering,  alteration, or destruction;

(ii)   maintaining the confidentiality and security of health  records;

(iii)   maintaining the unique identification of each inmate's health record;

(iv)   supervising the collection, processing, maintenance, storage, timely retrieval, distribution, and release of health records;

(v)   maintaining a predetermined, organized health record format; and

(vi)   retention of active health records and retirement of inactive health records.

(2)   Active and inactive health record files shall be retained according to all applicable laws.

§3-08 **Privacy and Confidentiality**.

(a)   *Policy.*

The Health Authority shall establish and implement written policies and procedures which recognize the rights of inmates to private and confidential treatment and consultations consistent with legal requirements, professional standards and sound professional judgment and practice.

(b)   *Privacy.*

33

(1)     All consultations and examinations between inmates and health care personnel will be confidential and private.

    (i)     correctional personnel may be present during the delivery of health services when health care and correctional personnel determine that such action is necessary for the safety and/or security of any person.

    (ii)     correctional personnel shall remain sufficiently distant from the place of health care encounters so that quiet conversations between inmates and health care personnel cannot be overheard. Every effort shall be made to maintain aural and, where possible, visual privacy during encounters between health care personnel and inmates.

(2)     Facility health care personnel shall not conduct body cavity searches or strip searches.

(c)     *Confidentiality.*

(1)     Information obtained by health care personnel from inmates in the course of treatment or consultations shall be confidential except as provided in paragraph (3) of this subdivision and §3-03(b)(3)(iv).

    (i)     all professional standards and legal requirements pertaining to the physician-patient privilege apply.

(2)     Active health records shall be maintained by health care personnel separately from the confinement record and shall be kept in a secure location.

    (i)     access to health records shall be controlled by the Health Authority.

    (ii)     health records shall not be released, communicated or otherwise made available to any person, except treatment personnel or as pursuant to a lawful court order, without the written authorization of the inmate, except in emergency situations described in §3-03(b)(3)(iv).

(3)     Health care personnel may report an inmate's health information to the chief correctional officer without the written consent of the inmate only when such information is necessary to provide appropriate health services for the inmate or to protect the health and safety of the inmate or others. Such information shall not include the specific diagnosis or the entire health record, but where necessary, may include the following:

(i)     the inmate's dietary restrictions and modifications, if any;

(ii)    known allergies and/or communicable diseases of the inmate, if any; and

(iii)   health information concerning an inmate's ability to work, placement in punitive segregation isolation, or hospitalization needs.

(4)    If an inmate has a communicable disease, the correctional authorities shall be instructed by health care personnel on proper precautions needed to protect correctional personnel and other inmates without being told disease-specific diagnoses for individual inmates.

(5)    The chief correctional officer shall keep confidential any inmate health-related information or records forwarded to him by health care personnel.

(6)    When an inmate communicates health-related information to correctional personnel in order to obtain access to health services or treatment of a health condition, then such information shall be kept confidential by correctional personnel.  An inmate need not disclose his specific medical complaint to correction personnel in order to obtain medical assistance.

(7)    In order to assure continuity of care and to avoid unnecessary duplication of tests and examinations, an inmate's health information shall be made available to health care personnel when that inmate is transferred to another correctional or health care facility.

(i)     when an inmate is transferred from one correctional facility to another within the New York City Department of Correction, the inmate's complete health record shall be transferred simultaneously.

(ii)    when an inmate is transferred to or from a municipal hospital ward, a pertinent summary of the inmate's health record shall accompany the transfer.

(iii)   when an inmate is transferred to another correctional system, a record summary defined by the receiving and sending systems shall accompany the inmate.

(iv)    complete health record information shall be transferred to specific and designated physicians outside the jurisdiction of the Department of Correction upon the request and written authorization of the inmate for the release of such information. The release form must specify the information to be transferred.

(d)    *Experimentation.*

    (1)    Biomedical, behavioral, pharmaceutical, and cosmetic research involving the use of any inmate in the custody of the New York City Department of Correction shall be prohibited except where:

        (i)    the inmate has voluntarily given his/her informed consent pursuant to subdivision (j) of §3-06; and

        (ii)    all ethical, medical and legal requirements regarding human research are satisfied; and

        (iii)    the research satisfies all standards of design, control and safety; and

        (iv)    the proposed research has been approved in writing from the Health Authority.

    (2)    The use of a new medical protocol for individual treatment of an inmate by his/her physician will not be prohibited, provided that such treatment is conducted subsequent to a full explanation to the inmate of the positive and negative features of the treatment and all requirements of subdivision (j) of §3-06 regarding informed consent are satisfied and that the protocol/treatment has been reviewed by the appropriate local and institutional review boards as required by all applicable federal, State and local laws. As an example, the protocol must be reviewed by an established human research, review committee with representation of inmate advocates.

§3-09 **Quality Assurance.**

(a)    *Policy.*

    (1)    The Health Authority shall establish and implement written policies and procedures for a Quality Assurance Program, which ensures the delivery of quality health care.  This program shall be systematic and include objective criteria for evaluating care and shall include procedures for the following:

        (i)    monitoring and evaluation of the quality, appropriateness, and effectiveness of health care services;  and

        (ii)    prompt identification and resolution of problems.

(2)     Hospital Prison Wards shall meet accepted community standards for accreditation. Each hospital that is designated to provide health services for inmates shall have a single physician of attending status responsible for all treatment provided to inmates in that hospital.

(b)     *Quality Assurance Program.*

(1)     The monitoring and evaluation activities of the Quality Assurance Program shall reflect the following:

(i)      the ongoing collection and/or screening and evaluation of information about health care services to identify opportunities for improving care and to identify problems that have an impact on health care provision and clinical performance;

(ii)     the use of objective criteria that reflect current knowledge and clinical experience;

(iii)    the identification of problems and improvement of the quality of health care through appropriate actions by administrative and health personnel; and

(iv)    documentation and reporting of the findings, conclusions, recommendations, actions taken and the results of such actions.

(2)     The administration and coordination of the overall Quality Assurance Program will be designed to assure the following:

(i)      all monitoring and evaluation activities are performed appropriately and effectively;

(ii)     necessary information is communicated within and between the Health Authority and the Department of Correction when problems or opportunities to improve health care involve more than one department or service.  Communication with the Department of Correction must be consistent with state law and subdivision (c) §3-08 of these standards regarding confidentiality;

(iii)    the status of identified problems shall be tracked to assure prompt improvement or timely resolution;

(iv)    all documented information and recordings will be statistically analyzed to detect trends, patterns of performance or potential problems;

(v)     a quarterly statistical report outlining the types of health care rendered and their frequency shall be prepared by the Health

37

Authority; and

> (vi)   the objectives, scope, organization, and effectiveness of the quality assurance program shall be evaluated at least annually and revised as necessary.

(3)   There shall be monthly meetings attended by the facility correctional administrator, the chief representative of Health Services at the facility and representatives of the medical, dental, and nursing staff.

> (i)   each meeting will include a written agenda as well as the taking and distribution of minutes.

(4)   All Hospital Prison Wards shall be inspected as part of the accreditation process by the Joint Commission on Accreditation of Hospitals (JCAH) and shall be in compliance with JCAH and State Department of Health standards. In addition, each hospital that is designated to care for inmates will submit as part of their quarterly written reports to the Health Authority, a section that reflects quality assurance activities concerning care provided to inmates.

(5)   The Health Authority shall annually conduct itself or contract for a formal evaluation of the quality, effectiveness, and appropriateness of health services provided to inmates in each New York City correctional facility. If the review is conducted by the Health Authority, it must be done by personnel other than those who provide care directly to inmates.

> (i)   At a minimum the evaluation will consist of the items outlined in paragraph (c) of this section.

> (ii)   The findings, conclusions, and recommendations of the Health Authority's evaluation shall be documented and distributed to the appropriate authorities, including the Board of Correction.

(c)   *Monitoring and Evaluation.*

(1)   The quality of care shall be evaluated and monitored to ensure that medical judgments are soundly made and documented and that medical procedures are appropriately performed and evaluated. Monitoring and evaluation shall assess the appropriateness of diagnostic and treatment procedures, the use of adequate and complete diagnostic procedures including laboratory and radiology studies when indicated. Other subjects which should be reviewed include but need not be limited to: in-service training for medical personnel; the provision of chronic care services; adherence to protocols as evidenced by chart review; whether protocols are updated to reflect current medical knowledge; and whether staff education is successfully conducted to ensure compliance with current

protocols.

(2)    The quality, content and completeness of medical and dental records and entries will be evaluated and shall at a minimum include verification of:

    (i)    timely and adequate transfer of appropriate health care documents and information when inmates are transferred to or from other correctional facilities; and

    (ii)    confidentiality and security of records.

(3)    The quality, completeness and efficiency of receiving screening services shall be evaluated, including at least a review of any cases where an inmate with a serious health problem, which went undetected at screening, was placed in the general population and of cases where there are substantial delays in conducting the screening.

(4)    An evaluation of the quality and appropriateness of surgical and anesthesia services shall be conducted and include at least the following:

    (i)    a regular and systematic evaluation of inmates who require hospitalization following surgery;

    (ii)    a regular review to ensure that procedures are done in appropriate time frames after they are ordered.

    (iii)    review of the inspection and testing of anesthetic apparatus before use; and

    (iv)    review of the documentation of surgical and anesthesia procedures, annual review and revision as necessary.

(5)    The quality and appropriateness of emergency services will be evaluated and include at least a review of the following:

    (i)    correctional and health personnel response times to emergencies; and

    (ii)    sufficiency of supplies, equipment, materials and emergency health care personnel.

(6)    An evaluation of quality control in radiology, pathology, and other laboratory services will be performed and include a review of at least the following:

    (i)    the documentation, accuracy, and completeness of procedures;

39

and

(ii)    all safety aspects of the radiology service.

(7)    Procedures for medication prescription, administration, and dispensing will be reviewed to ensure compliance with all applicable federal, state, and local laws.

(8)    Procedures for inventory control and documentation to account for the use of materials, supplies, equipment and medication shall be evaluated.

(9)    Staffing needs shall be evaluated regularly to assure the maintenance of an adequate number of qualified health care personnel as consistent with the needs of the correctional facility.

    (i)    Written job descriptions shall be reviewed to maximize the functional responsibility, authority, and utilization of available health care personnel and to make changes or additions where necessary;

    (ii)    All health care personnel will receive periodic job performance appraisals by their supervisors which will include licensure or certification renewal; and

    (iii)    In-service training shall be reviewed at least annually by the Health Authority to ensure that the quality, scope and effectiveness of training is adequate.

(10)    All powered emergency, radiology, pathology, surgical, and dental equipment shall be tested at intervals deemed necessary to assure their proper functioning, but in no case shall such intervals exceed six months.

(11)    Procedures for the management of hazardous materials and wastes in accordance with federal, State, and local laws and regulations shall be reviewed.

(12)    Documents and records will be made available to the Board of Correction by the Health Authority, Health and Hospitals Corporation and the Department of Correction in a timely fashion to allow the Board to monitor compliance with all parts of these standards.  These records do not include individual medical records for living inmates, which must be obtained using standard procedures of informed consent and release.

## §3-10 Inmate Death.

(a)    *Policy.*

The Department of Correction shall establish policies and procedures to ensure that in the case of an inmate's death, prompt notification is made to family and appropriate officials, and with the Health Authority, shall ensure that a thorough and timely review of the death is conducted.

(b)     *Notification.*

In the event of an inmate death, the Department of Correction shall notify the Medical Examiner's Office and the inmate's next of kin immediately.

(c)     *Review.*

1)      A postmortem examination shall be performed promptly whenever an inmate dies in the custody of the Department of Correction.  A copy of the report will be sent to the Board of Correction.

(2)     The Board of Correction shall conduct an investigation of inmate deaths including the review of all medical records of the deceased.  Appropriate reviews will be discussed by the Prison Death Review Board that the Board of Correction will staff and the Deputy Mayor for Public Safety's Office will convene.  The Prison Death Review Board will meet on an as-needed basis and will include representatives from the Mayor's office, the Health Authority, the Department of Mental Health, Mental Retardation and Alcoholism Services, the Health and Hospitals Corporation, the Department of Correction, the Board of Correction and other health care providers involved in the care of the deceased.

(3)     Nothing in this section substitutes for the reviews that must be conducted of every death by the Health Authority and the Department of Correction.

§3-11 **Disaster Plan.**

(a)     *Policy.*

There shall be policies and procedures for the management  and delivery of health care in the event of a man-made or natural disaster.

(b)     *Disaster Plan.*

(1)     The Health Authority and the Department of Correction shall be responsible for designing written policies and procedures to provide timely and orderly emergency services in the event of a natural or man-made disaster.  This disaster plan shall include, but not be limited to the following:

41

       (i)      use of an alert system;

       (ii)     use of emergency equipment and supplies;

       (iii)    re-assignment of health care and correctional personnel Department-wide to best meet each facility's needs;

       (iv)    a training program and schedule;

       (v)     security, storage, and maintenance of medical supplies and health records;

       (vi)    delivery of medical and dental supplies;

       (vii)   use of ambulance services; and

       (viii)  periodic recorded practice drills and staff training.

    (2)     The disaster plan must be approved by the Health Authority and the Department of Correction and reviewed and updated annually. Certification of annual review must be sent to the Board of Correction.

## §3-12 Shackling of Inmates.

(a)    *Policy.*

The Department of Correction, the Health Authority, and the Health and Hospitals Corporation shall develop and implement procedures governing the shackling of inmates who are receiving medical treatment and are housed in beds outside secure medical wards at the municipal hospitals. Inmates housed outside secure medical wards shall not be routinely shackled. The decision to shackle shall be made on a case by case basis and shall not serve as a substitute for appropriate security precautions or as punishment or for the convenience of staff. Shackling of inmates being transported between clinical settings shall be the least restrictive possible. All non-emergency decisions to shackle inmates must not be medically contraindicated.

(b)    *Definition.*

Shackling includes the use of all devices which encircle the ankle or wrist of an inmate and restrict movement.

(c)    *Procedures.*

The procedures developed for inmates housed in hospitals in beds outside of secure medical wards must include the following:

(1)     Shackling shall be used only upon the direction of the Chief Correctional Officer or his/her designee after a review of the individual case. Pending the receipt of security-related information necessary to perform the review, an inmate may be shackled unless he/she falls into categories listed in paragraph (3)(i) through (iv) of this subsection.  This security-related information must be obtained promptly.

(2)     Shackling shall only be used when a Chief Correctional Officer or his/her designee demonstrates with clear and articulable facts that twenty-four hour officer coverage may be insufficient to protect the safety of others or to prevent escape.

(3)     An inmate who is to be restrained shall be seen by a physician.  DOC will not shackle an inmate where a physician has determined that the inmate is:

　　　(i)     pregnant and admitted for delivery of a baby; or

　　　(ii)     dependent on a ventilator or respirator; or

　　　(iii)     in imminent danger or expectation of death (unless the inmate while in the condition described by (i)(iii) of this paragraph attempts to escape or engages in violent behavior at the hospital which presents a danger of injury); or

　　　(iv)     where shackling is medically contraindicated.  Provided, however, that should an inmate attempt to escape or engage in violent behavior at the hospital that presents a danger of injury, he/she may be restrained pending an immediate review of his/her medical condition by a physician to determine whether the use of shackles threatens the inmate's life.  DOC shall promptly make alternative security arrangements before the restraints are removed, unless a life-threatening condition exists.  In the case of a life-threatening condition, the shackles shall be removed immediately.

(4)     At least daily, physicians shall update and review the medical condition of shackled inmates.  They shall convey their findings to the Department of Correction including whether the use of mechanical restraints, while the inmate ambulates, is medically contraindicated.

(5)     A shackled inmate shall be given the opportunity to use the bathroom as often as the need arises unless the physician has ordered the use of bed pans instead.

(6)     The decision to shackle an inmate shall be reviewed on a daily basis by a Chief Correctional Officer or his/her designee and must be revised

immediately if a physician determines that the shackles have become medically contraindicated.  In the latter case, unless a life-threatening medical emergency exists, DOC shall have the opportunity to make alternative security arrangements, if necessary, before the shackles are removed. These arrangements must be made promptly.

(7)   All decisions to apply mechanical restraints will be made by the Department of Correction's office of operations.

(8)   Written records shall be maintained at the hospitals which indicated the reason for shackling, the time and date of the approval for shackling, the name and title of the person giving approval, and the inmate's name, book and case number and medical status.

(9)   Hospital-based physicians caring for inmates outside secure medical wards at the municipal hospitals shall receive training in this standard.

§3-13 **Variances.**

(a)     *Policy.*

Any Department may apply for a variance from a specific Section or Subdivision of these minimum standards when compliance cannot be achieved or continued.

A "limited variance" is an exemption granted by the Board from full compliance with a particular section or subdivision for a specified period of time.

A "continuing variance" is an exemption granted by the Board from full compliance with a particular section or subdivision for an indefinite period of time.

An "emergency variance" as defined in paragraph (c)(3) of this section is an exemption granted by the Board from full compliance with a particular section or subdivision for no more than 30 days.

(b)     *Variances Prior to Effective Date.*

A Department may apply to the Board for a variance prior to the effective date of a particular section or subdivision when:

(1)     despite its best efforts and the best efforts of other New York City officials and agencies, full compliance with the section or subdivision cannot be achieved by the effective date; or

(2)     compliance is to be achieved in a manner other than specified in the section or subdivision.

(c)     *Limited, Continuing and Emergency Variances.*

(1)     A Department may apply to the Board for a limited variance when:

(i)     despite its best efforts, and the best efforts of other New York City officials and agencies, full compliance with the section or subdivision cannot be achieved; or

(ii)     compliance is to be achieved for a limited period in a manner other than specified in the section or subdivision.

(2)     A Department may apply to the Board for a continuing variance when despite its best efforts and the best efforts of other New York City officials compliance cannot be achieved in the foreseeable future because:

(I)     full compliance with a section or subdivision creates extreme practical difficulties as a result of circumstances unique to the

45

design of a particular facility, and lack of full compliance would not create a danger or undue hardship to staff or inmates; or

(ii)    compliance is to be achieved in an alternative manner sufficient to meet the intent of the section or subdivision.

(3)    A Department may apply to the Board for an emergency variance when an emergency situation prevents continued compliance with the section or subdivision. An emergency variance for a period of less than 24 hours may be declared by a Department when an emergency situation prevents continued compliance with a particular section or subdivision. The Board or a designee shall be immediately notified of the emergency situation and the variance application.

(d)    *Variance Application.*

(1)    An application for a variance must be made in writing to the Board by the Commissioner of a Department as soon as a determination is made that continued compliance will not be possible and shall state:

(i)    the type of variance requested;

(ii)    the particular section or subdivision at issue;

(iii)    the requested commencement date of the variance;

(iv)    the efforts undertaken by a Department to achieve compliance;

(v)    the specific facts or reasons making full compliance impossible, and when those facts and reasons became apparent;

(vi)    the specific plans, projections and timetables for achieving full compliance;

(vii)    the specific plans for serving the purpose of the section or subdivision for the period that strict compliance is not possible; and

(viii)    if the application is for a limited variance, the time period for which the variance is requested, provided that this shall be no more than six months.

(2)    In addition to the provisions of paragraph (1) of this section, an application for a continuing variance shall state:

(i)    the specific facts and reasons underlying the impracticability or impossibility of compliance within the foreseeable future, and when

those facts and reasons became apparent; and

    (ii)    the degree of compliance achieved and the Department's efforts to mitigate any possible danger or hardships attributable to lack of full compliance; or

    (iii)    a description of the specific plans for achieving compliance in an alternative manner sufficient to meet  the intent of the section or subdivision.

(3)    In addition to the requirements of paragraph (1), an application for an emergency variance for a period of 24 hours or more (or for renewal of an emergency variance) shall state:

    (i)    the specific facts or reasons making continued  compliance impossible, and when those facts and reasons became apparent;

    (ii)    the specific plans, projections and timetables for achieving full compliance; and

    (iii)    the time period for which the variance is requested, provided that this shall be no more than thirty days.

(e)    *Variance Procedure for Limited and Continuing Variances.*

(1)    Prior to a decision on a variance application for a limited or continuing variance, whenever practicable, the Board will consider the positions of all interested parties, including correctional employees, health service professionals, inmates and their representatives, other public officials and legal religious and community organizations.

(2)    Whenever practicable, the Board shall hold a public meeting or hearing on the variance application and hear testimony from all interested parties.

(3)    The Board's decision on a variance application shall be in writing.

(4)    Interested parties shall be notified of the Board's decision as soon as practicable and no later than 5 business days after the decision is made.

(f)    *Granting of Variance.*

(1)    The Board shall grant a variance only if it is convinced that the variance is necessary and justified.

(2)    Upon granting a variance, the Board shall state:

(i)     the type of variance;
(ii)    the date on which the variance will commence;
(iii)   the time period of the variance, if any; and
(iv)    any requirements imposed as conditions on the variance.

(g)  *Renewal of Variance.*

(1)    An application for a renewal of a limited or emergency variance shall be treated in the same manner as an original application as provided in paragraph (c)(f) of this section.  The Board shall not grant renewal of a variance unless it finds that, in addition to the requirements for approving an original application, a good faith effort has been made to comply with the section or subdivision within the previously prescribed time limitation, and that the requirements set by the Board as conditions on the original variance have been met.

(2)    A petition for review of a continuing variance may be made upon the Board's own motion or by officials of a Department, or its employees, inmates or their representatives.  Upon receipt of a petition, the Board shall review and reevaluate the continuing necessity and justification for the continuing variance.  Such review shall be conducted in the same manner as the original application as provided in paragraphs (c)-(f) of this section.  The Board will discontinue the variance, if after such review and consideration, it determines that:

(i)     full compliance with the standard can now be achieved; or

(ii)    requirements imposed as conditions upon which the continuing variance was granted have not been fulfilled or maintained; or

(iii)   there is no longer compliance with the intent of the section or subdivision in alternative manner as required by paragraph (b)(ii) of this section.

(3)    The Board shall specify in writing and publicize the facts and reason for its decision on an application for renewal or review of a variance.  The Board's decision must comply with the requirements of subdivision (f), and, in the case of limited and continuing variances, paragraphs (e)(3) and (4).  Where appropriate, the Board shall set an effective date for discontinuance of a continuing variance after consultation with all interested parties.

§3-14 **Effective Date.**

These standards (§§3-01 through 3-13) shall take effect May 15, 1991.


§3-15 **Implementation Dates.**

The policies, procedures, criteria, plans, programs and forms required by the various subdivisions of these standards shall be developed, approved and implemented within the time periods stated below.  All time periods are computed from the effective date of these standards.

| Subdivision | Implementation |
| --- | --- |
| 3-02(d)(7) | 3 months |
| 3-02(f)(1) | 4 months |
| 3-02(f)(2)iii | 14 months |
| 3-02(f)(4) | 4 months |
| 3-05(b)(1) | 4 months |
| 3-06(h)(2),(6),(7) | 4 months |
| 3-07(a)(1),(2) | 4 months |
| 3-09(a)(1) | 4 months |
| 3-09(b)(1-5) | 4 months |
| 3-09(c)(1-12) | 4 months |
| 3-11(a) | 8 months |
| 3-11(b)(1),(2) | 8 months |


Dated:  April 10, 1991
Robert Kasanof, Chair